**Kenzo KURODA, Plaintiff,**

v.

**SPJS HOLDINGS, L.L.C., Liberty Square Asset Management, L.L.C., WGL Capital Corp., Warren G. Lichtenstein, Thomas J. Niedermeyer, Jr., and Claire A. Walton, Defendants.**

Civil Action No. 4030–CC.

Court of Chancery of Delaware.

Submitted: Jan. 30, 2009.
Decided: April 15, 2009.

Collins J. Seitz, Jr., David E. Ross, and Ryan P. Newell, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; of Counsel: Reid M. Figel, David L. Schwarz, and Kelly P. Dunbar, of Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., Attorneys for Plaintiff.

Edward McNally, Lewis H. Lazarus, and Jason C. Jowers, of Morris James LLP, Wilmington, Delaware; of Counsel: Howard J. Kaplan, Lisa C. Solbakken, and Sara Welch, of Arkin Kaplan Rice LLP, New York, New York, Attorneys for Defendants.

## OPINION

CHANDLER, Chancellor.

Plaintiff's primary claim in this case is that he is owed money pursuant to a limited liability company agreement. From around 2002 to 2006, plaintiff served as an investment adviser for a group of entities that invested in publicly traded Japanese corporations. As part of this arrangement, plaintiff entered into various agreements with defendants, including the limited liability company agreement at issue in this case. Plaintiff alleges that he did not receive the payments to which he was entitled under this agreement and that he was assigned excess income for tax purposes in violation of the agreement. Plaintiff also seeks a declaration of his right under the agreement to receive certain payments in the future and a declaration that his formation of an investment fund did not violate the terms of the agreement. In addition, plaintiff brings claims for tortious interference with contract, tortious interference with prospective economic advantage, breach of the implied covenant of good faith and fair dealing, conversion, unjust enrichment, and civil conspiracy.

Defendants moved to dismiss some, but not all, of plaintiff's claims under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, defendants' motion to dismiss the breach of contract claims against Liberty Square Asset Management, L.L.C. and WGL Capital Corp. is denied. On the conditions set forth below, plaintiff's claims for (1) breach of contract for the improper tax allocation, (2) tortious interference with contract, (3) tortious interference with prospective economic advantage, (4) breach of the implied covenant of good faith and fair dealing, (5) conversion, (6) unjust enrichment, and (7) civil conspiracy, are all dismissed for failure to state a claim upon which relief can be granted.

## I. BACKGROUND

Plaintiff Kenzo Kuroda is a sophisticated investment adviser, with more than twenty years of experience working on highly specialized corporate finance and mergers and acquisitions transactions involving publicly

traded Japanese corporations.[1] Defendants Thomas J. Niedermeyer, Jr. and Warren G. Lichtenstein were introduced to Kuroda through a mutual acquaintance in late 2000. During 2001, the parties explored the formation of a private investment fund that would invest in Japanese public corporations.

In 2001, Niedermeyer and Lichtenstein, acting through defendants Liberty Square Asset Management, L.L.C. ("Liberty Square") and WGL Capital Corp. ("WGL Capital") respectively, formed a private fund to invest in small to mid-size, publicly traded Japanese companies.[2] Liberty Square is operated by defendants Niedermeyer and Claire A. Walton, and WGL Capital is operated by Lichtenstein. The structure of the fund involved the creation of two investment funds—Steel Partners Japan Strategic Fund (Offshore), L.P. ("Master Fund") and Steel Partners Japan Strategic Fund, L.P. ("Feeder Fund")—as well as a series of affiliated entities to manage and provide investment advice to those funds.[3] The Master Fund was to serve as the principal investment vehicle for making investments in Japanese companies, while the Feeder Fund was structured to serve as a vehicle for United States investors to invest in the Master Fund.

At all relevant times, defendant SPJS Holdings, L.L.C. ("SPJS Holdings"), a Delaware limited liability company, has been the general partner of the Master Fund.

SPJS Holdings is governed by the Second Amended and Restated Limited Liability Company Agreement of SPJS Holdings ("LLC Agreement"), which was executed by WGL Capital, Liberty Square, Kuroda, and non-party Yusuke Nishi. The LLC Agreement establishes that Kuroda and Nishi are non-managing members of SPJS Holdings and that Liberty Square and WGL Capital are managing members of SPJS Holdings. Non-party Steel Partners Japan Asset Management, which is principally owned by Liberty Square and WGL Capital, was created to provide management services to the Master Fund.

In November 2001, Kuroda and Nishi formed Steel Partners Japan, K.K. ("SPJ–KK"), a Japanese corporation, to provide investment advisory services to defendants.[4] SPJ–KK entered into a consulting agreement with Steel Partners Japan Asset Management, and pursuant to this agreement, Kuroda provided a variety of management services for the benefit of defendants.

Plaintiff alleges that he was compensated for his services in two ways. First, as a non-managing member of SPJS Holdings, Kuroda had a right to 16–2/3% of any incentive allocations that SPJS Holdings received from the Master Fund pursuant to the July 1, 2004 Amended and Restated Limited Partnership Agreement of Steel Partners Japan Strategic Fund (Offshore), L.P.[5] Second, as a shareholder of SPJ–KK,

---

**1.** The facts herein are drawn from the Verified Complaint ("complaint") and are assumed true for purposes of the motion to dismiss.

**2.** Liberty Square is a Delaware LLC with its principal place of business in Boston, Massachusetts. WGL Capital is a Colorado corporation with its principal place of business in New York, New York.

**3.** The Master Fund is a partnership formed under the laws of the Cayman Islands. The

Feeder Fund is a Delaware limited partnership. The principal place of business of the Master Fund and the Feeder Fund is Boston, Massachusetts.

**4.** Kuroda owns 50% of the outstanding stock of SPJ–KK.

**5.** SPJS Holdings annually receives 20% of any increase in the value of the Master Fund's investments.

Kuroda shared (with Nishi) approximately one-third of the 2% management fee (after deducting out expenses) paid to Steel Partners Japan Asset Management.

From on or about January 1, 2002 to June 30, 2006, Kuroda provided consulting and investment advice to defendants. During this time, Kuroda, acting through SPJ–KK, was a primary source of investment ideas for the Master Fund. Kuroda was responsible for the identification of potential investments in Japanese corporations, for conducting due diligence on the Master Fund's investments, for providing advice on the terms and structuring of those investments, and for reviewing the operations of the companies in which the Master Fund invested. Kuroda was also a principal spokesperson on behalf of defendants.

At the end of 2005, Kuroda began to have significant and increasing differences of opinion with Lichtenstein and Niedermeyer regarding the appropriate methods for pursuing shareholder activism in Japan. Kuroda, a Japanese national with extensive experience in Japanese business practices, believed that the increasingly confrontational approach being advocated and pursued by Lichtenstein and Niedermeyer would be counterproductive and reflected a fundamental lack of sophistication about business practices in Japan. Kuroda was also uncomfortable with actions taken by WGL Capital, Liberty Square, Lichtenstein, Niedermeyer, and Walton that, Kuroda believed, improperly disadvantaged the non-managing members of SPJS Holdings. Ultimately, these disagreements led Kuroda to inform defendants that he could no longer serve as an adviser to the Steel Partners entities. Kuroda indicated that he was willing to negotiate his withdrawal as a non-managing member of SPJS Holdings and as a shareholder of SPJ–KK, but that he intended to preserve his rights until the parties had reached a complete agreement.

Lichtenstein, Niedermeyer, and Walton expressed concerns about the impact that Kuroda's departure would have on current and potential investors, including the possibility that a public dispute among the initial partners would cause investors to lose confidence in the Master Fund and withdraw their investments. In an attempt to minimize the effect of Kuroda's departure, Lichtenstein, Niedermeyer, and Walton agreed with Kuroda to publicly disclose that Kuroda's departure was mutually amicable. To further allay investor concerns, Kuroda agreed to continue to provide investment advice to defendants and to delay the date of his formal separation until June 30, 2006. In mid–2006, Kuroda and several partners founded a private investment fund, Fugen Capital Management LLC ("Fugen"), to invest in Japanese corporations.

The parties engaged in negotiations regarding Kuroda's separation from SPJS Holdings. During these negotiations, defendants made offers that Kuroda believed did not reflect the fair market value of Kuroda's membership interest in SPJS Holdings and the funds he would be entitled to receive under the LLC Agreement. The parties were unable to reach an agreement, and Kuroda initiated this action. In the complaint, Kuroda alleges that defendants refused to pay him incentive allocations owed to him under the parties' agreements. The complaint also alleges that in 2007, Liberty Square, Walton, and Niedermeyer caused SPJS Holdings to issue Kuroda an inaccurate Schedule K–1 that purported to assign Kuroda nearly $10 million of income for the 2006 tax year despite the fact that SPJS Holdings refused to recognize Kuroda's contractual right to share in the incentive allocations earned by SPJS Holdings during the tax year.

Kuroda also alleges that during the negotiations Kuroda formally requested an immediate payment of all specific amounts held for his direct and indirect benefit in his capital accounts at the Master Fund and SPJS Holdings. Kuroda received a payment reflecting 90% of the amount of the then-current balance in his investment capital account at SPJS Holdings. Defendants have refused, however, to pay Kuroda the 10% that remained in his investment capital account as of June 30, 2006, allegedly in violation of the relevant agreements.

Kuroda further alleges that defendants attempted to undermine his reputation and interfere with his economic opportunities in order to save the personal reputations of Lichtenstein, Niedermeyer, and Walton. The complaint alleges that defendants: (1) threatened Kuroda repeatedly with baseless legal claims; (2) caused the dissemination of false and misleading information in the business media concerning Kuroda's separation from SPJS Holdings, falsely suggesting that Kuroda had been forced out of SPJS Holdings for performance reasons; and (3) violated the LLC Agreement and their duties to Kuroda repeatedly while engaging in bad faith and unreasonable negotiating tactics.

On October 27, 2008, defendants moved to dismiss some, but not all, of the claims in the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[6] This is my decision on defendants' motion to dismiss.

## II. ANALYSIS

On a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state claim upon which relief can be granted, the Court must accept the factual allegations in the complaint as true and make all reasonable inferences from those facts in the plaintiff's favor.[7] Conclusory allegations, however, without supporting factual allegations, will not be accepted as true.[8] Under this standard, if Kuroda pleads any set of facts that would entitle him to relief, then the motion to dismiss must fail.

### A. Breach of Contract Claims Against Liberty Square and WGL Capital

The complaint alleges that SPJS Holdings, WGL Capital, and Liberty Square breached the LLC Agreement by failing to pay Kuroda incentive allocations he is owed, by failing to honor Kuroda's request to withdraw the full balance of his investment capital account, and by issuing Kuroda a federal Schedule K–1 that improperly assigned him taxable income. Defendants Liberty Square and WGL Capital contend that the breach of contract claims against them should be dismissed because they are not liable for SPJS Holdings' purported breaches of the LLC Agreement. Because I am not convinced that defendants' interpretation of the LLC Agreement is the only reasonable interpretation, the breach of contract claims against Liberty Square and WGL Capital cannot be dismissed.

Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members. Among other things, a company's LLC

**6.** Lichtenstein, Niedermeyer, and Walton moved to dismiss under Rule 12(b)(6) for failure to state a claim and under Rule 12(b)(2) for lack of personal jurisdiction. The motion to dismiss for lack of personal jurisdiction is not yet before the Court.

**7.** *Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544, 548 (Del.Ch.2001).

**8.** *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 65–66 (Del.1995).

agreement defines when members of the LLC can be liable for breach of provisions of that agreement. Accordingly, as with any contract, the Court must look to the language of the LLC Agreement to determine the potential liabilities of the parties. In analyzing a contract on a motion to dismiss under Rule 12(b)(6), the Court must interpret ambiguous provisions in the light most favorable to the nonmoving party.[9]

Liberty Square and WGL Capital contend that as Class A Managing Members of SPJS Holdings they are insulated from liability arising from the contractual obligations of SPJS Holdings by § 1.06 of the LLC Agreement. Section 1.06 provides, in part, that:

> Except as otherwise expressly provided in the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.[10]

Defendants argue that this language makes clear that only SPJS Holdings can be held liable for the payments at issue, and that Liberty Square and WGL Capital cannot be held liable for those payments.

In response, plaintiff contends that he does not seek to hold Liberty Square or WGL Capital liable "solely by reason of [their] being a Member" of SPJS Holdings. Rather, plaintiff argues, the breach of contract claims are asserted against Liberty Square and WGL Capital on the grounds that as managing members they are assigned authority to carry out the business and affairs of SPJS Holdings[11] and that they took affirmative steps in contravention of their own obligations under a contract to which they are signatories—the LLC Agreement. According to plaintiff, there is nothing in the LLC Agreement that would allow the managing members to refuse to return funds in violation of the LLC Agreement and then claim immunity from suit.

Plaintiff also argues that both § 1.06 of the LLC Agreement and § 18–303 of the Delaware Limited Liability Company Act limit the liability of members to third parties and not to other members for breach of the LLC Agreement. Section 1.06 of the LLC Agreement is substantively identical to § 18–303(a), which is entitled "Liability to 3rd parties." Thus, plaintiff argues, § 1.06 applies solely to liability to third parties and has no bearing on the liability between members. This interpretation of the language of § 1.06 of the LLC Agreement, which tracks the language of § 18–303(a), is supported by case

---

**9.** *VLIW Tech., LLC v. Hewlett–Packard Co.,* 840 A.2d 606, 615 (Del.2003) ("Because the provisions at issue in the Agreement are susceptible to more than one reasonable interpretation, for purposes of deciding a motion to dismiss, their meaning must be construed in the light most favorable to the non-moving party.").

**10.** Section 1.06 tracks the language of 6 *Del. C.* § 18–303(a), which is entitled "Liability to 3rd parties" and provides that:
> Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.

**11.** *See* LLC Agreement § 2.01(a).

law.[12] Additionally, plaintiff points to § 205(a) of the LLC Agreement, which provides, in part, as follows:

> No Member or Affiliate (collectively, the "Indemnifying Parties") shall be liable to any Member, Affiliate or the Company (collectively, the "Indemnified Parties") for mistakes of judgment or for any action or inaction, unless such mistakes, action or inaction arise out of, or are attributable to, the gross negligence, willful misconduct or bad faith of the Indemnifying Party, in which case such Indemnifying Party shall be liable to the Indemnified Parties. . . .

Plaintiff argues that because the breach of the LLC Agreement alleged by Kuroda constitutes a type of "action or inaction," § 2.05(a) clearly contemplates that members can be liable to one another for their breach of provisions of the LLC Agreement.

Liberty Square and WGL Capital, in turn, contend that the relevant question is not whether they are insulated from liability, but whether they can be held responsible for SPJS Holdings' obligation to pay Kuroda under the LLC Agreement. Liberty Square and WGL Capital argue that they are not liable for the debts of SPJS Holdings unless they agree to be so bound, and that there is no provision in the LLC Agreement making them responsible for the payments.

Liberty Square and WGL Capital argue that, as a matter of law, they cannot be held liable for breach of the provisions of the LLC Agreement—a binding contract to which they are signatories. While this is certainly one reasonable interpretation of the LLC Agreement, I am not convinced that it is the only reasonable interpretation. Sections 1.06 and 2.05(a) purport to limit the liability of members of SPJS Holdings, but under at least one reasonable interpretation, neither of these provisions limits the liability of managing members for the kinds of breaches alleged in the complaint. Section 1.06 of the LLC Agreement states that no member shall be liable "solely by reason of being a Member" of the LLC. Thus, under at least one reasonable interpretation, it does not limit liability for reasons other than status as a member. Section 2.05(a) specifies that members of SPJS Holdings shall not be liable to another member "for mistakes of judgment or for any action or inaction, unless such mistakes, action or inaction arise out of, or are attributable to, the gross negligence, willful misconduct or bad faith" of the member. Breach of the provisions of the LLC Agreement can reasonably be described as "any action or inaction," and defendants have not argued that they are exculpated from liability under the terms of this section. Thus, the language of § 2.05(a) suggests that the parties to the LLC Agreement knew how to clearly define their liability to each other

---

12. *See Pepsi–Cola Bottling Co. of Salisbury, Md. v. Handy,* 2000 WL 364199 (Del.Ch. Mar.15, 2000). The Court in *Pepsi–Cola* emphasized the importance of the word "solely" in § 18–303(a) when it stated that:

> [The] phrase, "solely by reason of being a member . . ." does imply that there are situations where LLC members and managers would not be shielded by this provision. As two leading Delaware corporation law treatise commentators have observed: "The word 'solely,' which is used in Section 18–303, indicates that a member or manager will not be liable for the debts, obligations, or liabilities of a Delaware LLC only by reason of being a member or manager; however, other acts or events could result in the imposition of liability upon or assumption of liability by a member or manager."

*Id.* at *3 (quoting R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* 20–6 (3rd ed.1998)).

and chose not to limit that liability so as to preclude the breach of contract claims alleged in the complaint.[13]

Finally, the provisions of the LLC Agreement under which Kuroda is suing do not make clear whether a managing member of SPJS Holdings could be liable for breach of the provisions of the LLC Agreement, assuming, as I must, that the managing member would not be exculpated under § 1.06 or § 2.05(a). Kuroda alleges that Liberty Square and WGL Capital breached the terms of several provisions of the LLC Agreement, including §§ 3.04, 3.05, 3.06, 3.07, 3.09, 4.03, 6.01, and 8.02. These provisions do no specify whether members can be held responsible for their breach. Given the ambiguity in these provisions regarding whether managing members and signatories to the LLC Agreement can be liable for their breach, and the ambiguity created by §§ 1.06 and 2.05(a), I am unable to conclude that defendants' interpretation—that the managing members cannot, as a matter of law, be liable for breach of the provisions of the LLC Agreement—is the only reasonable interpretation of the LLC Agreement. Accordingly, Liberty Square and WGL Capital are not entitled to dismissal of the breach of contract claims.[14]

### B. Breach of Contract for the Income Tax Allocations

In count IV of the complaint, Kuroda alleges that SPJS Holdings, Liberty Square, and WGL Capital breached provisions of the LLC Agreement by improperly assigning taxable income to Kuroda in his 2006 federal Schedule K–1. Because plaintiff has failed to properly allege the essential element of damages, count IV of the complaint must be dismissed.

To state a claim for breach of contract, Kuroda "must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[15] A plaintiff must properly allege each of these elements, even where the plaintiff is seeking an equitable remedy such as specific performance. Kuroda argues that the issuance of a Schedule K–1 that overstates his income causes him harm by allocating to him tax liability for income that he was never paid. Absent from the complaint, however, is any allega-

---

**13.** Again, in reaching this conclusion, and only for purposes of the motion to dismiss, I construe contract provisions that are susceptible to more than one meaning in the light most favorable to plaintiff.

**14.** Kuroda seeks an accounting of the performance of the Master Fund and the incentive allocations earned by SPJS Holdings on investments made prior to June 30, 2006. In connection with this claim, Kuroda seeks to examine the relevant books and records of the Master Fund and requests that the Court order SPJS Holdings, WGL Capital, and Liberty Square to provide Kuroda with access to relevant materials. Defendants argue that this claim should be dismissed because it is a books and records claim that must be brought in a separate proceeding. Kuroda is seeking an adjustment of SPJS Holdings' accounts to reflect the incentive allocations he is owed under the LLC Agreement, and argues that the fact that the inspection of certain books and records may be required to complete the accounting does not implicate any separate inspection rights that would have to be brought in a separate proceeding. I decline to dismiss this claim at this stage of the proceedings. Although defendants are correct that a books and records action must generally be brought as a separate proceeding, it is not clear that plaintiff is seeking such an inspection. It may still be necessary for plaintiff to inspect some records in order to properly determine his entitlement to an adjustment of the accounts of SPJS Holdings.

**15.** *VLIW Tech.*, 840 A.2d at 612.

tion that Kuroda paid taxes on money that he never received. Kuroda is a Japanese citizen and does not allege that he paid or even owes taxes in the United States or that he paid higher taxes or suffered any adverse tax consequences as a result of the issuance of the improper schedule.

Kuroda contends that an audit by the tax authorities is a logical and reasonably foreseeable consequence of the issuance of the improper tax schedule. This contention, however, is contained only in plaintiff's brief, and not in the complaint. Additionally, even if the complaint contained such an allegation, it would still constitute little more than speculation, especially considering that Kuroda has not alleged that he pays taxes in the United States. The possibility of such a speculative harm is not sufficient to state a claim for breach of contract. Unless this Court is more certain of whether and when plaintiff will suffer any harm as a result of the allegedly improper allocation of income, it would be a waste of judicial resources to render an advisory opinion on the issue.[16] Accordingly, the complaint does not properly allege an essential element of the breach of contract claim in count IV, and that claim must be dismissed.[17]

### C. Tortious Interference with Contract

In count VI of the complaint, Kuroda alleges that Lichtenstein, Niedermeyer, and Walton tortiously interfered with Kuroda's contractual interests under the LLC Agreement. The complaint alleges that Kuroda had a valid and binding contract, that these defendants had knowledge of the contract, and that they caused SPJS Holdings, WGL Capital, and Liberty Square to breach the contract. Because the complaint fails to make factual allegations that support a reasonable inference that Lichtenstein, Niedermeyer, and Walton acted outside the scope of their authority, the tortious interference claims against them must be dismissed.

It is well settled that a party to a contract cannot be held liable for breaching the contract and for tortiously interfering with that contract.[18] Thus, to state a claim for tortious interference with contract the complaint must contain factual allegations that support a reasonable inference that Lichtenstein, Niedermeyer, and Walton were each "a stranger to both the contract and the business relationship giving rise to and underpinning the contract."[19] According to the allegations in the complaint, Lichtenstein controlled WGL Capital and Niedermeyer and Walton controlled Liberty Square. Liberty Square and WGL Capital, as managing members, controlled SPJS Holdings. Thus, as long as Lichtenstein, Niedermeyer, and Walton were acting with the scope of their authority in their respective roles in Liberty Square, WGL Capital, and SPJS Holdings, they cannot be liable for tortious interference with contract.[20]

---

16. See generally Schick Inc. v. Amalgamated Clothing & Textile Workers Union, 533 A.2d 1235, 1239 (Del.Ch.1987) ("[J]udicial resources are limited and must not be squandered on disagreements that have no significant current impact and may never ripen into legal actions seeking coercive relief.").

17. The breach of contract claim in count IV is dismissed without prejudice. If plaintiff pays higher taxes (or suffers any other injury) as a result of the allegedly improper allocation of income, he is free to re-file the claim.

18. Shearin v. E.F. Hutton Group, Inc., 652 A.2d 578, 590 (Del.Ch.1994).

19. Tenneco Auto., Inc. v. El Paso Corp., 2007 WL 92621, at *5 (Del.Ch. Jan.8, 2007) (quoting Atlanta Mkt. Ctr. Mgmt. Co. v. McLane, 269 Ga. 604, 503 S.E.2d 278, 283 (1998)).

20. See Shearin, 652 A.2d at 590 ("[I]t has been held that employees or directors of a contracting corporation cannot be held personally liable for inducing a breach of con-

Plaintiff contends that the allegations in the complaint are sufficient to state a cause of action for tortious interference because Lichtenstein, Niedermeyer, and Walton exceeded the scope of their agency. The complaint, however, does not contain *factual* allegations to support this claim. The complaint states only conclusory allegations that defendants acted for personal reasons and therefore exceeded the scope of their authority. For example, the complaint alleges that defendants interfered with Kuroda's contractual relations as part of a campaign of personal retaliation in which they sought both "to protect [their] personal reputations and interests" and "to enrich themselves at Mr. Kuroda's expense." [21] Plaintiff contends that because defendants disagree with this assertion, there is a factual dispute that cannot be resolved on a motion to dismiss.

Despite plaintiff's efforts to create a factual dispute, the allegations in the complaint are not sufficient to state a claim for tortious interference against Lichtenstein, Niedermeyer, and Walton, even under the liberal notice pleading standard of our rules. The Court is not required to accept mere conclusory allegations as true, and Kuroda's claims that Lichtenstein, Niedermeyer, and Walton acted because of a personal agenda, without more, do not adequately allege that they exceeded the scope of their authority.

■ The conclusory allegations in the complaint stand in contrast to the factual allegations that have been found sufficient to state a claim in other cases. For example, in *Nye v. University of Delaware*,[22] the Court found that the plaintiff "clearly alleged *facts* sufficient" to sustain a claim for tortious interference with contractual relations.[23] Among the facts alleged in *Nye* were allegations that defendants, the provost of the University and the chair of a committee appointed to evaluate the Dean of a college at the University, circulated a petition of "no confidence" against the Dean, misrepresented the results of the petition to the committee, refused to allow the members of the committee to see the results of the petition, refused to allow the Dean to meet with the committee, and lied to the Dean by telling him that the committee was not interested in his side of the story.[24] It was these facts, among others, that led the *Nye* Court to conclude that the plaintiff had adequately alleged facts to support an inference that the defendants had acted outside the scope of their authority.[25] Similarly, in *Nelson v. Fleet National Bank*,[26] the defendant was alleged to have "harassed and mistreated [the plaintiffs] because of their sex," which led the District Court to conclude that the plaintiff had stated a claim for tortious interference with contract because "such allegations could, but do not necessarily, support a finding that [the defendant] acted outside the scope of his employment." [27] In contrast to the factual allegations in *Nye* and *Nelson,* the complaint in this case is devoid of any *factual* allegations that lead to a reasonable inference that Lichtenstein, Niedermeyer, or Walton acted

tract by their corporations when they act within their role.") (citations omitted); *Fisk Ventures, LLC v. Segal,* 2008 WL 1961156, at *12 n. 56 (Del.Ch. May 7, 2008).

21. Compl. ¶ 126.

22. 2003 WL 22176412 (Del.Super.Ct. Sept.17, 2003).

23. *Id.* at *7 (emphasis added).

24. *Id.* at *2.

25. *Id.* at *7.

26. 949 F.Supp. 254 (D.Del.1996).

27. *Id.* at 263–64.

outside the scope of their authority.[28] Accordingly, the claim in count VI for tortious interference with contract must be dismissed.[29]

### D. Tortious Interference with Prospective Economic Advantage

In count VII of the complaint, Kuroda seeks to recover from defendants for their alleged tortious interference with his economic expectancies. The complaint alleges that defendants tortiously interfered with Kuroda's economic expectancies by consciously disparaging Kuroda's business acumen and threatening Kuroda with baseless litigation. Specifically, the complaint alleges that on February 20, 2007, Bloomberg Japan posted a story online that stated that Kuroda left SPJS Holdings as a result of performance issues. Later that day, Bloomberg published a correction of the story and stated that the correction was a result of a request from Steel Partners. Thus, plaintiff alleges, the selective correction of the article left the impression that defendants had ratified the remaining incorrect factual statements in the article regarding Kuroda's reasons for leaving SPJS Holdings. Kuroda also alleges that defendants threatened him with litigation to deter him from pursuing legitimate business ventures. The complaint further alleges that defendants were aware of Kuroda's new business ventures and that their conduct was motivated by a desire to destroy Kuroda's reputation and salvage the reputations of Lichtenstein, Niedermeyer, and Walton. Kuroda contends that, as a result, he "had concrete economic opportunities foreclosed to him," and that he "turned away potential investors in Fugen and some prospective investors have held off further discussion with Fugen because" of defendants' conduct.[30] Because the complaint does not properly allege that Kuroda was harmed individually, apart from his interest in Fugen, the claim for tortious interference with economic advantage must be dismissed.

To survive dismissal on the claim for tortious interference with prospective economic advantage, Kuroda must allege: "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d)

28. In a footnote in plaintiff's opposition to defendants' motion to dismiss, Kuroda argues that the Court cannot dismiss the tortious interference with contract claim because to do so would require the Court to conclude that Lichtenstein, Niedermeyer, and Walton were acting in the interests of Liberty Square and WGL Capital when they allegedly caused them to breach their contractual and fiduciary obligations to Kuroda. It is not so. The claim is dismissed because Kuroda has failed to meet his burden to plead facts that, with the benefit of reasonable inferences, could give rise to a claim upon which relief could be granted. Moreover, although some cases may have rejected the position that managers of an LLC have no fiduciary duty at all to ensure that the LLC lives up to its contractual obligations, that is not an invitation for the Court to allow claims for tortious interference with contract against LLC managers (or those who control the managers) any time a plaintiff alleges that the LLC breached a contractual duty to a member of an LLC. *See Shearin*, 652 A.2d at 590.

29. In count V of the complaint, Kuroda seeks a declaratory judgment that his departure from SPJS Holdings and his formation of Fugen were legally permissible. Defendants argue that this claim should be dismissed as to Lichtenstein, Niedermeyer, and Walton because they are not personally parties to the SPJS Holdings LLC Agreement or members of SPJS Holdings. I agree, and the declaratory judgment claim is dismissed as to Lichtenstein, Niedermeyer, and Walton to the extent that it seeks a declaration based on Kuroda's duties under the LLC Agreement or as a member of SPJS Holdings.

30. Compl. ¶ 133.

damages."[31] Additionally, Delaware law is clear that direct claims are available only where the member has suffered damage that is independent of any damage suffered by the limited liability company.[32] Kuroda has failed to allege any harm to himself individually because all of Kuroda's alleged harms flow through his involvement with Fugen. For example, the complaint states that "Kuroda had a reasonable probability and concrete expectation of economic advantage through his participation in Fugen" and that defendants "had knowledge of Mr. Kuroda's economic expectancies via Fugen."[33] Kuroda also alleges that defendants "intentionally interfered with Mr. Kuroda's economic expectancies arising from Fugen" and that Kuroda was harmed because he turned away potential investors in Fugen and because some prospective investors held off further discussions with Fugen because of the threats of litigation.[34] Plaintiff has not made any *factual* allegations that would support a reasonable inference that he personally had a reasonable probability of a business opportunity and was denied that opportunity as a result of defendants' conduct. All the harms that Kuroda allegedly suffered as a result of defendants' allegedly tortious conduct only affected Kuroda through his interest in Fugen. Accordingly, any claim for those damages must be asserted by Fugen, and Kuroda has not properly asserted a derivative claim on behalf of Fugen.

Although Kuroda states that he was harmed individually and is claiming damages based on a direct injury, he has made no *factual* allegations that support a reasonable inference that he suffered an injury apart from injury that flows to him as a result of his interest in Fugen. Accordingly, the claim in count VII for tortious interference with prospective economic advantage must be dismissed.[35]

### E. Breach of the Implied Covenant of Good Faith and Fair Dealing

■ In count VIII of the complaint, Kuroda alleges that SPJS Holdings, Liberty Square, and WGL Capital breached the implied covenant of good faith and fair dealing through "arbitrary, unreasonable, and/or deceitful conduct," including (1) failing to pay Kuroda monies that they know he is due, (2) using threats of litigation to coerce Kuroda and to retaliate against him, (3) sabotaging negotiations in an effort to reduce the amounts due to Kuroda, and (4) disparaging Kuroda in connection with his work with defendants.[36] The complaint alleges that this conduct has "prevented Mr. Kuroda from realizing the full benefits of his contractual relationships" with defendants.[37] Because plaintiff has failed to articulate a contractual benefit he was denied as a result of defendants' breach of an implied provision of the contract, the claim for breach of the implied covenant of good faith and fair dealing must be dismissed.

---

31. *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del.1981) (quoting *DeBonaventura*, 419 A.2d 942, 947 (Del.Super.Ct.1980)).

32. *See* 6 Del. C. § 18–1001; *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del.2004).

33. Compl. ¶¶ 129–30.

34. Compl. ¶¶ 131–33.

35. This claim is dismissed without prejudice, and plaintiff is granted leave to re-plead this claim if he can make factual allegations that he was injured personally, apart from injury he suffered as a result of his interest in Fugen.

36. Compl. ¶ 137.

37. *Id.* ¶ 139.

The implied covenant of good faith and fair dealing inheres in every contract and "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." [38] The implied covenant cannot be invoked to override the express terms of the contract.[39] Moreover, rather than constituting a free floating duty imposed on a contracting party, the implied covenant can only be used conservatively "to ensure the parties' 'reasonable expectations' are fulfilled." [40] Thus, to state a claim for breach of the implied covenant, Kuroda "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." [41] General allegations of bad faith conduct are not sufficient. Rather, the plaintiff must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract. Consistent with its narrow purpose, the implied covenant is only rarely invoked successfully.[42]

The allegations in the complaint fail to state a claim for breach of the implied covenant of good faith and fair dealing. To the extent that Kuroda's implied covenant claim is premised on the failure of defendants to pay money due under the contract, the claim must fail because the express terms of the contract will control such a claim. Again, the implied covenant cannot be invoked to override express provisions of a contract. Additionally, the complaint fails to draw a sufficient connection between the alleged violations of the implied covenant and a specific implied obligation in the contract. For example, the allegation that defendants disparaged Kuroda with respect to his work in the Steel Partners entities is not tied to an implied obligation in the contract. Moreover, even assuming that the allegations of "sabotaging" negotiations, threatening "baseless" litigation, and disparaging Kuroda with respect to his work for Steel Partners could be tied to an implied obligation in the contract, Kuroda has failed to allege any contractual benefit he was denied as a result of this conduct. The complaint only states in the most conclusory way that "SPJS Holdings', WGL Capital's, and Liberty Square's wrongful conduct has prevented Mr. Kuroda from realizing the full benefits of his contractual relationships with the Steel Partners Japan Entities." [43] Again, the purpose of the implied covenant is to ensure that a party to a contract is not prevented "from receiving the fruits of the bargain." [44] Thus, to properly plead a claim for breach of the implied covenant, Kuroda must allege some injury to his contractual inter-

---

38. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del.2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del.Ch. 1985)).

39. *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del.Ch.1992) ("[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play.").

40. *Dunlap*, 878 A.2d at 442.

41. *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del.Ch. Nov.10, 1998).

42. *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *6 (Del.Ch. Aug.25, 2006) ("[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare.")

43. Compl. ¶ 139.

44. *Dunlap*, 878 A.2d at 442 (internal quotation marks omitted).

est as a result of the breach of the implied obligation. The complaint fails to plead such an injury except in the most conclusory way. Additionally, Kuroda's alleged injuries that result from defendants' purported failure to pay him amounts to which he is entitled under the LLC Agreement are, according to the complaint, governed by express provisions of the LLC Agreement.[45] Accordingly, the claim for breach of the implied covenant of good faith and fair dealing must be dismissed.[46]

### F. Conversion

 In count IX of the complaint, Kuroda brings a claim for conversion. The complaint alleges that "SPJS Holdings, WGL Capital, and Liberty Square have exercised wrongful dominion and control" over specific monies—10% of the approximately $6.3 million—in Kuroda's "Investment Capital Account" at SPJS Holdings.[47] Kuroda further alleges that he is entitled to "the return of the specific amounts remaining in his Investment Capital Account" "independent of any obligation or duty arising under contract."[48] Although the allegations in the complaint recite the

elements of conversion, the complaint fails to state a claim for conversion because the claim is duplicative of Kuroda's breach of contract claim and because the claim does not fall into the narrow exception to the general rule prohibiting claims for the conversion of money.

 Conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it."[49] Where, however, the plaintiff's claim arises solely from a breach of contract, the plaintiff "generally must sue in contract, and not in tort."[50] Thus, in order to assert a tort claim along with a contract claim, the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract.[51]

Plaintiff attempts to meet this requirement by alleging that defendants' exercise of control over Kuroda's property "breaches the common-law duty against the conversion of property" and is unlawful "independent of any obligation or duty arising under contract."[52] While the complaint recites the standard for pleading a tort claim along with a contract claim, it is

---

**45.** Kuroda alleges that defendants delayed or sabotaged negotiations in order to reduce the amounts due to Kuroda. Compl. ¶ 137(f), (h). Kuroda does not allege, or even explain in his brief, how such tactics have denied him a benefit under the contract such that he would have a claim for breach of the implied covenant even in the face of express provisions in the LLC Agreement that govern his rights. Kuroda is suing defendants for their failure to pay him under the provisions of the LLC Agreement, and according to the complaint, those provisions govern his right to receive the payments he seeks.

**46.** Defendants have not yet answered the complaint or otherwise taken a position regarding the enforceability and interpretation of the contract. The claim for breach of the implied covenant of good faith and fair dealing is therefore dismissed without prejudice.

**47.** Compl. ¶¶ 142–143.

**48.** *Id.* ¶¶ 145–147.

**49.** *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933).

**50.** *Data Mgmt. Internationale, Inc. v. Saraga*, 2007 WL 2142848, at *3 (Del.Super.Ct. July 25, 2007) ("In preventing gratuitous 'bootstrapping' of contract claims into tort claims, courts recognize that a breach of contract will not generally constitute a tort.") (citations omitted).

**51.** *Id.*

**52.** Compl. ¶ 145.

devoid of any substantive allegation that defendants violated a duty in tort. Merely alleging that defendants violated their duty against conversion of property is circular, and the Court is not required to accept such a conclusory allegation as true.[53] As I explained, conversion is the wrongful exercise of dominion over the property of another, in denial of that person's right, or inconsistent with it. Thus, to establish a claim for conversion apart from the contract claim, Kuroda would have to show that he had a right to the money—other than a right pursuant to the contract—that was violated by the defendants' exercise of dominion over the money. The only right articulated in the complaint is Kuroda's right to the money pursuant to the contract. Because the complaint fails to identify the interference with a right to the money independent of rights granted under the contract, the conversion claim must be dismissed.

Moreover, the complaint fails to state a claim for conversion because Kuroda's conversion claim does not fall into the narrow exception to the general rule prohibiting claims for the conversion of money. Generally, an action in conversion will not lie to enforce a claim for the payment of money.[54] Although other jurisdictions have recognized a narrow exception to this general rule, plaintiff points to no Delaware cases that recognize an exception that would encompass plaintiff's claim.[55] Moreover, the allegations in the complaint would not fall within the narrow exception recognized in other jurisdictions, which allows a claim for conversion of money "only when it can be described or identified as a specific chattel, but not where an indebtedness may be discharged by the payment of money generally."[56] Thus, "an action for conversion of money will lie only where there is an 'obligation to return the identical money' delivered by the plaintiff to the defendant."[57]

The conversion claim asserted in the complaint does not fall within this exception. Kuroda is not seeking the return of money that could be described or identified as a specific chattel. Although Kuroda argues that he seeks "specific" or "segregated" funds in an "Investment Capital Account," what plaintiff is seeking is still satisfaction of a contractual obligation that could be satisfied "by the payment of money generally."[58] Accordingly, the conversion claim must be dismissed.

## G. Unjust Enrichment

In count X of the complaint, plaintiff alleges that defendants were unjustly enriched at Kuroda's expense. The complaint alleges that Kuroda's services "were

**53.** See Int'l Bus. Machs. Corp. v. Comdisco, Inc., 1993 WL 259102, at *4 (Del.Super.Ct. June 30, 1993) ("Plaintiffs begin their conversion argument by stating that while an immediate right to possession is an element of conversion, [the defendant's] tortious conversion of the system gave [the plaintiff] an immediate right to possession. This reasoning is circular, and functions to eliminate an element of the tort.").

**54.** See Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc., 1995 WL 694397, at *16 (Del.Ch. Nov.21, 1995); Goodrich v. E.F. Hutton Group, Inc., 542 A.2d 1200, 1203 (Del.Ch. 1988).

**55.** I express no opinion on whether Delaware should or will recognize an exception to the general rule in different circumstances. I only hold that Delaware does not recognize an exception that would allow Kuroda to bring a conversion claim in these circumstances.

**56.** Goodrich, 542 A.2d at 1203.

**57.** Id. (quoting Lyxell v. Vautrin, 604 F.2d 18 (5th Cir.1979)).

**58.** Id.

an important part of performance of the Master Fund during all relevant periods," but that "Kuroda has not been adequately compensated for the unique value he bestowed upon the Master Fund," while defendants have been so compensated.[59] The complaint further alleges that there is "no reasonable justification" for the enrichment of defendants at the expense of Kuroda personally and that "Mr. Kuroda has no adequate remedy at law in the event [the] subject matter of Mr. Kuroda's claims is not governed by enforceable contracts."[60] Because Kuroda's unjust enrichment claim cannot lie alongside his breach of contract claim, the unjust enrichment claim must be dismissed.

 Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[61] A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim. In other words, if "the contract is the measure of [Kuroda's] right, there can be no recovery under an unjust enrichment theory independent of it."[62] Thus, "[w]hen the complaint alleges an express, enforceable contract that controls the parties' relationship … a claim for unjust enrichment will be dismissed."[63]

Kuroda alleges the existence of, and brings claims for the breach of, contracts between himself and certain of the defendants. Kuroda contends that he is owed money pursuant to the terms of the LLC Agreement, and that defendants have failed to pay him in violation of their contractual obligations. In count X of the complaint, plaintiff alleges that defendants were unjustly enriched by the services "he provided pursuant to the Consulting Agreement."[64] It is thus clear from the face of the complaint that plaintiff's relationship with the defendants is governed by an express contract.[65]

 Plaintiff argues that the unjust enrichment claim should not be dismissed as to the individual defendants because they are not party to the relevant contracts. This argument fails, however, because unjust enrichment cannot be used "to circumvent basic contract principles [recognizing] that a person not a party to [a] contract cannot be held liable to it."[66]

59. Compl. ¶¶ 150–52.

60. *Id.* at ¶¶ 153–54.

61. *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del.1988)).

62. *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del.1979).

63. *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at * 18 (Del.Ch. Oct.10, 2006) (revised Oct. 16, 2006); *In re Lear Corp. S'holder Litig.*, 2008 WL 4053221, at * 13 & n. 72 (Del.Ch. Sept.2, 2008); *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *5 & n. 41 (Del.Ch. May 16, 2007).

64. Compl. ¶ 150.

65. *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *8 (Del.Ch. Aug.26, 2005) ("In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls.").

66. *See MetCap*, 2007 WL 1498989, at *6 (modifications in original) (quoting *WSFS v. Chillibilly's Inc.*, 2005 WL 730060, at * 19 (Del.Super.Ct. Mar.30, 2005)).

Thus, Kuroda cannot use a claim for unjust enrichment to extend the obligations of a contract to Lichtenstein, Niedermeyer, and Walton, who are not parties to the contract. Accordingly, plaintiff's claim for unjust enrichment must be dismissed.[67]

### H. Civil Conspiracy

■ Count XI of the complaint brings a claim against defendants for civil conspiracy. The complaint alleges that "[d]efendants knowingly entered into a confederation or combination to pursue unlawful ends vis-à-vis Mr. Kuroda, including violations of implied covenants of good faith and fair dealing and tortious interference with Mr. Kuroda's contractual interests and economic expectancies."[68] This claim must be dismissed because plaintiff has failed to properly allege the elements of an underlying wrong that would be actionable in the absence of a conspiracy.[69]

■ Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong.[70] Thus, if plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed.[71] None of the acts alleged in the complaint constitute an underlying wrong on which a claim of conspiracy could be based. As explained above, plaintiff's claims for (1) tortious interference with contract, (2) tortious interference with economic advantage, and (3) breach of the implied covenant of good faith and fair dealing, all fail to state a claim upon which relief can be granted. Plaintiff has thus failed to state a claim for civil conspiracy because he has not properly alleged an underlying wrong on which a claim of conspiracy could be based.[72] Additionally, unless the breach also constitutes an independent tort, a breach of contract cannot constitute an underlying wrong on which a claim for civil conspiracy could be based; similarly, a claim for civil conspiracy cannot be predicated on a breach of the implied *contractual* covenant of good faith and fair dealing unless the breach also constitutes an independent tort.[73] Accordingly, the claim for conspira-

---

**67.** The unjust enrichment claim is dismissed without prejudice. As plaintiff points out, defendants have not yet answered the complaint or stipulated to the existence of a binding contract. Accordingly, plaintiff is free to re-file his unjust enrichment claim to the extent it is not governed by an enforceable contract.

**68.** Compl. ¶ 157.

**69.** *Connolly v. Labowitz,* 519 A.2d 138, 143 (Del.Super.Ct.1986) ("To be actionable a civil conspiracy must embody an underlying wrong which would be actionable in the absence of the conspiracy.").

**70.** *Ramunno v. Cawley,* 705 A.2d 1029, 1039 (Del.1998).

**71.** *Transched Sys. Ltd. v. Versyss Transit Solutions, LLC,* 2008 WL 948307, at *4 (Del.Super.Ct. Apr.2, 2008) ("To succeed on a claim of civil conspiracy Plaintiff must first have a valid underlying claim."); *see also Interim*

*Health Care v. Fournier,* 1994 WL 89007, at *8 n. 18 (Del.Ch. Feb.28, 1994) ("Because [the plaintiff] has failed to prove by a preponderance of the evidence that the defendants misappropriated its proprietary and confidential information, it has also failed to establish that the defendants committed any unlawful acts in furtherance of a conspiracy. The plaintiff's civil conspiracy claim therefore fails.").

**72.** *Brooks–McCollum v. Shareef,* 2006 WL 3587246, at *3 (Del.Super.Ct. Nov.1, 2006) ("It is not the conspiracy itself, but rather the underlying wrong that must be actionable, even without the alleged conspiracy.").

**73.** Just as a plaintiff generally cannot use a claim for tortious interference with contract to impose additional damages on contracting parties (or their agents), a plaintiff cannot use a claim for civil conspiracy to impose on contracting parties (or their agents) additional damages for breach of a contract, beyond those available under contract law for breach of the contract. *See E.I. DuPont de Nemours*

cy must be dismissed.[74]

## III. CONCLUSION

The core of plaintiff's claim in this case is that he is owed money pursuant to a limited liability company agreement to which he is a party. Generally, when a plaintiff's claims are governed by a contract, the available remedies will be limited to those available for breach of that contract. Accordingly, it should come as no surprise that the complaint has failed to state a claim upon which relief can be granted for many of the non-contractual claims that were asserted in the complaint. The parties will confer and submit a form of order consistent with this Opinion.

& Co. v. Pressman, 679 A.2d 436, 445 (Del. 1996) ("Unless the bad faith rises to the level of an independent tort, which itself would support an award of punitive damages, mere bad faith on the part of a party to a contract will not give rise to punitive damages.") (quoting Anderson, *Damages Under the Uniform Commercial Code* § 11:35 (1992 & Supp. 1995)). This rule is consistent with the theory of efficient breach, which would be undermined if contracting parties and their agents were subject to potential liability for civil conspiracy based on a breach of a contract or the implied covenant. *See id.* at 445–46.

74. On page 38 of his brief in opposition to defendants' motion to dismiss, plaintiff alleges that "[t]he Complaint additionally pleads facts establishing that WGL Capital and Liberty Square violated fiduciary duties that they owed to the members of SPJS Holdings." The complaint, however, does not assert a claim for civil conspiracy based on an underlying wrong of breach of fiduciary duty. Moreover, I am not convinced that Kuroda has alleged facts that lead to a reasonable inference that Lichtenstein, Niedermeyer, and Walton acted for personal reasons and thus exceeded the scope of their agency. Therefore, plaintiff has not adequately alleged facts that support a claim that the affiliated entities under common control conspired with one another or with Lichtenstein, Niedermeyer, and Walton. *See In re Transamerica Airlines, Inc.,* 2006 WL 587846, at *6 (Del.Ch. Feb, 28, 2006) ("[A] corporation generally cannot be deemed to have conspired with its wholly owned subsidiary, or its officers and agents."); *Amaysing Techs. Corp. v. CyberAir Commc'ns, Inc.,* 2005 WL 578972, at *7 (Del. Ch. Mar.3, 2005).