**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

JOHN JOSEPH SMITH, IV,       )
KENILWORTH VENTURES, LLC,    )
JOHN JOSEPH SMITH, IV, as trustee of  )
the JJS 2015 Trust, JOHN JOSEPH   )
SMITH, IV, as trustee of the John J. Smith  )
Revocable Trust, KENILWORTH    )
DESIGN BUILD, LLC,        )
                         )
         Plaintiffs,    )
                         )
       v.          )      **C.A. No. 2020-0263-JRS**
                         )
THOMAS M. SCOTT, CA VENTURES,  )
LLC, CAR TEAM HOLDINGS, LLC, CA  )
STUDENT LIVING TEAM HOLDINGS,  )
LLC, CA SENIOR, LLC, aka CA SENIOR  )
LIFESTYLE, LLC, aka CA SENIOR   )
LIVING, LLC, CA STUDENT LIVING  )
TEAM MANAGER, LLC, CA STUDENT  )
LIVING HOLDING COMPANY, LLC,   )
CAV GLOBAL, LLC, CAV EUROPE   )
HOLDING, LLC, CA INDUSTRIAL,   )
LLC, CA DESIGN BUILD, LLC, CA   )
SENIOR LIVING INVESTMENT    )
MANAGEMENT, LLC, CASL     )
INVESTMENT MANAGEMENT, LLC,   )
CA RESIDENTIAL INVESTMENT    )
MANAGEMENT, LLC, CA VENTURES  )
HOLDING, LLC, CA STUDENT LIVING  )
TEAM MANAGER, LLC, CA STUDENT  )
LIVING OPERATING COMPANY, LLC,  )
CA MANAGER, LLC, ANTHONY    )
DiBIASE, CA VENTURES     )
INVESTMENT MANAGEMENT, LLC,   )
CAMPUS ACQUISITIONS     )
MANAGEMENT, LLC,      )
                         )
         Defendants.  )

**MEMORANDUM OPINION**

Date Submitted: April 15, 2021
Date Decided: April 23, 2021

David E. Wilks, Esquire and D. Charles Vavala, Esquire of Wilks Law, LLC, Wilmington, Delaware, and Douglas Albritton, Esquire of Actuate Law LLC, Chicago, Illinois, Attorneys for Plaintiffs.

Robert A. Penza, Esquire and Stephen J. Kraftschik, Esquire of Polsinelli PC, Wilmington, Delaware and Anthony C. Porcelli, Esquire and Scott M. Gilbert, Esquire of Polsinelli PC, Chicago, Illinois, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Plaintiff, John Joseph Smith, individually and on behalf of entities he controls, alleges that Defendants, Thomas M. Scott, CA Ventures, LLC, and a number of other related entities formed by Scott and CA Ventures (the "CA Ventures Subsidiary LLCs"), terminated him from his employment with CA Ventures without cause, but nevertheless stripped him of certain accumulated equity and other interests (the "Vested Interests") in twelve of the CA Ventures Subsidiary LLCs as if he had been terminated for cause.[1] According to Smith, those interests are worth as much as $70 million today. Defendants deny the allegations and maintain that Smith was terminated for cause and, therefore, has forfeited his right to the Vested Interests.

Plaintiffs' Verified Complaint comprises seven counts.[2] Count I seeks a declaratory judgment that Smith's termination was without cause and in bad faith, that his Vested Interests were not forfeited and that Defendants are required to repurchase the Vested Interests at fair market value.[3] Count II alleges breach of contract arising from Defendants' breach of the CA Ventures LLC Agreements

---

[1] This Opinion follows the parties' submissions and adopts the nomenclature "Vested Interests" to describe the various economic interests in the CA Ventures Subsidiary LLCs that Smith alleges have been wrongfully taken from him. The Vested Interests include various "units," "membership interests" and "profits interests," as provided in each of the operative LLC Agreements and illustrated in the chart below.

[2] Verified Compl. ("Compl.") (D.I. 1).

[3] Compl. ¶¶ 88–90.

1

(defined below) by terminating Smith without cause and stripping him of his Vested Interests.[4]  Count III alleges breach of the implied covenant of good faith and fair dealing related to Scott's alleged bad faith termination of Smith without cause.[5] Count IV alleges breach of fiduciary duty[6] and Count V alleges conversion,[7] both based largely on the same factual predicate as Counts I–III.  Finally, Counts VI and VII assert claims under Illinois law, with Count VI alleging a violation of the Illinois Wage Payment and Collection Act (the "Wage Act") and Count VII alleging defamation.[8]

Defendants have moved to dismiss most, but not all, counts of the Complaint. They seek dismissal of Counts I and II only to the extent Plaintiffs seek a judgment compelling Defendants to pay the fair market value of the Vested Interests.[9] Defendants seek dismissal of all other counts for failure to state viable claims. The implied covenant claim fails, they say, because the conduct at issue is governed

---

[4] Compl. ¶¶ 92–97.

[5] Compl. ¶¶ 98–106.

[6] Compl. ¶¶ 107–114.

[7] Compl. ¶¶ 115–122.

[8] Compl. ¶¶ 123–134.

[9] D.I. 18; Compl. ¶¶ 87–146.  To the extent the Complaint seeks this remedy in connection with other counts of the Complaint, Defendants seek dismissal of those prayers for relief as well.

by contract. Similarly, they argue the breach of fiduciary duty and conversion claims cannot stand alongside breach of contract claims arising from the same conduct. They additionally assert that the fiduciary duty claim is precluded by the LLC Agreements' limitation of liability. And finally, the Wage Act and defamation claims must be dismissed, they say, for failure to well plead requisite elements.

As explained below, my ruling is a mixed bag. As for Defendants' request that I dismiss Plaintiffs' prayer for a buyout remedy, the request is premature. It is reasonably conceivable that the buyout remedy falls within the reasonable expectancy of the parties at the time of contracting. Likewise, the implied covenant claim survives because it is reasonably conceivable, as alleged, that Defendants manufactured bases to terminate Smith for cause in violation of the covenant of good faith that is implied within Smith's employment contract and the LLC Agreements. The conversion claim survives because, at least for now, it is reasonably conceivable that it is not duplicative of the breach of contract claim. Finally, Plaintiffs' claim for violation of the Wage Act well pleads that Smith's Vested Interests can reasonably be considered "earned wages" and that the forfeiture of such interests, assuming the allegations in the Complaint are true, amounts to an improper deduction from those wages.

Plaintiffs remaining claims must be dismissed. The breach of fiduciary duty claim fails because it is supplanted by the contractual standards of conduct set forth

in the LLC Agreements, and the Complaint fails to well plead a violation of those standards. Plaintiffs' claim for defamation must be dismissed because this court, on balance, will not exercise subject matter jurisdiction over common law defamation claims. All claims against Anthony DiBiase must be dismissed for failure to make any allegation of wrongdoing. And the prayer for punitive damages must be dismissed as this court of equity does not award punitive remedies.

## I. BACKGROUND

I have drawn the facts from well-pled allegations in the Complaint and documents incorporated by reference or integral to that pleading.[10] For purposes of the motion, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[11]

### A. Parties

Plaintiff, Smith, was an employee of Defendant, Scott, for nearly thirteen years, serving as an executive in connection with a number of ventures Scott owned and operated.[12] He is a resident of the State of Illinois.[13]

---

[10] Compl.; *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a Motion to Dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[11] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[12] Compl. ¶ 1.

[13] Compl. ¶ 12.

4

Plaintiff, Kenilworth Ventures, LLC ("Kenilworth Ventures"), is an Illinois LLC, with Smith acting as its sole managing member.[14] This entity held several of the Vested Interests that Smith allegedly acquired during his time working for Scott, each laid out in more detail in the chart below.[15]

Plaintiff, JJS 2015 Trust, is an Illinois trust, with Smith acting as sole trustee.[16] Similar to Kenilworth Ventures, this entity held several of Smith's Vested Interests.[17]

Plaintiff, John J. Smith Revocable Trust ("JJS Revocable Trust"), is also an Illinois trust, with Smith acting as sole trustee.[18] Again, this entity owned certain of Smith's Vested Interests.[19]

---

[14] Compl. ¶ 13.

[15] *Id.*

[16] Compl. ¶ 14.

[17] *Id.*

[18] Compl. ¶ 15.

[19] *Id.*

Plaintiff, Kenilworth Design Build, LLC, is an Illinois LLC, with Smith acting as the sole managing member.[20] This entity owned certain Vested Interests in Defendant, CA Design Build, LLC.[21]

Defendant, Scott, founded and operates in some form each of the fifteen LLCs listed in Column 1 of the chart below.[22] Like Smith, he is a resident of Illinois.[23] As indicated, the chart lists each of the relevant CA Ventures Subsidiary LLCs, all of which are Delaware LLCs, and each individual or LLC that managed the LLC, as well as the corresponding Vested Interest that Smith either claims directly or through one of his wholly owned or controlled entities:

*Remainder of Page Intentionally Left Blank*

---

[20] Compl. ¶ 16.

[21] *Id.*

[22] Compl. ¶ 19.

[23] Compl. ¶ 17.

6

| Entity | Manager/Managing Member | Smith's Initial Ownership/Investment |
|---|---|---|
| CA Ventures, LLC[24] | Thomas Scott | N/A |
| CAR Team Holdings, LLC[25] | CA Ventures Holdings, LLC | JJS 2015 Trust: 200,000 units |
| CA Student Living Team Holding, LLC[26] | CA Student Living Team Manager, LLC | JJS 2015 Trust and Smith individually: 220,000 units |
| CA Student Living Team LLC[27] | CA Student Operating Company, LLC | Kenilworth Ventures: 17.021% profits interest |
| CA Senior, LLC[28] | CA Senior Manager, LLC | Kenilworth Ventures: 12.15% membership interest plus an additional $160,000 investment |
| CA Student Living Holding Company, LLC[29] | CA Manager, LLC | Kenilworth Ventures: 8.15% membership interest plus an additional $313,000 investment |
| CAV Global, LLC[30] | Anthony DiBiase | Kenilworth Ventures: 5% membership interest |

---

[24] Compl. ¶¶ 18, 19.

[25] Compl. ¶¶ 19(a)–(b).

[26] Compl. ¶¶ 19(c)–(d).

[27] Compl. ¶¶ 19(e)–(f).

[28] Compl. ¶¶ 19(g)–(h).

[29] Compl. ¶¶ 19(i)–(j).

[30] Compl. ¶¶ 19(k)–(l).

| | | |
|---|---|---|
| CAV Europe Holdings, LLC[31] | CA Manager, LLC | (1) JJS Revocable Trust: 5% membership interest<br>(2) Plaintiffs collectively: $100,000 investment |
| CA Industrial, LLC[32] | CA Manager, LLC | (1) Kenilworth Ventures: 7.5% membership interest<br>(2) Plaintiffs collectively: $100,000 investment |
| CA Design Build, LLC[33] | CA Manager, LLC | Kenilworth Design: 15% profits interest |
| CA Senior Living Investment Management, LLC[34] | CA Ventures Investment Management, LLC | JJS Revocable Trust: 5% profits interest |
| CASL Investment Management, LLC[35] | CA Ventures Investment Management, LLC | (1) JJS Revocable Trust: 2.8% profits interest<br>(2) JJS 2015 Trust: 7.2% profits interest |
| CA Residential Investment Management, LLC[36] | CA Ventures Investment Management, LLC | JJS Revocable Trust: 5% profits interest |
| Campus Acquisitions Management, LLC[37] | Thomas Scott | N/A |
| CA Manager, LLC[38] | Thomas Scott | N/A |

---

[31] Compl. ¶¶ 19(m)–(n).

[32] Compl. ¶¶ 19(o)–(p).

[33] Compl. ¶¶ 19(q)–(r).

[34] Compl. ¶¶ 19(s)–(t).

[35] Compl. ¶¶ 19(u)–(v).

[36] Compl. ¶¶ 19(w)–(x).

[37] Compl. ¶ 21.

[38] Compl. ¶ 22.

## B. CA Ventures

Scott founded CA Ventures in the mid-2000s as a vehicle to acquire student-housing apartments.[39] Smith became CA Ventures' first executive-level employee in 2007, at a time when the company "had less than $75 million in assets under management, annual revenue of less than $2 million, approximately 15 property-management personnel, and had never completed a new construction real-estate development project."[40]

Today, CA Ventures has more than 1,300 employees and 135 assets under management worth more than $10 billion. It operates as a vertically integrated management company with a variety of real estate asset classes, including student, senior, multi-family, office, hospitality and international development opportunities.[41] Each of the Defendants is either an LLC controlled by CA Ventures or a manager of an LLC controlled by CA Ventures (many of the managers themselves, as standalone LLC entities, are likewise controlled by CA Ventures).[42] Scott sits atop all of these entities as the controller of CA Ventures.[43]

---

[39] Compl. ¶¶ 24–25.

[40] *Id.*

[41] Compl. ¶ 26.

[42] Compl. ¶¶ 28, 30–32.

[43] Compl. ¶ 28.

## C. Smith's Ongoing Role at CA Ventures

Smith has a background in architecture and started at CA Ventures as a project manager overseeing CA Ventures' first ground-up development.[44]  Throughout his thirteen-year stint at CA Ventures and the CA Ventures Subsidiary LLCs, Smith sourced, created and oversaw the execution of nearly $6 billion in real-estate assets.[45]  For example, from 2007 to 2010, Smith oversaw nearly $300 million in assets across college campuses; from 2010 to 2015, he oversaw the creation of new buildings totaling over $1.5 billion in value creation; and in 2012, he played an integral role in the sale of certain assets for $627 million, which allowed Scott to expand into new lines of business and diversify CA Ventures' product offerings.[46] In recognition of his prior successes, Scott promoted Smith to the position of Chief Operating Officer of CA Ventures in 2015, a role he occupied until 2017.[47] His responsibilities over the years spread across all of CA Ventures' various business lines, and as a result, he received equity interests and other forms of incentive compensation from several of the CA Ventures Subsidiary LLCs.[48]

---

[44] Compl. ¶ 35.

[45] *Id.*

[46] Compl. ¶¶ 36, 39(c).

[47] Compl. ¶ 36.

[48] Compl. ¶ 40.

Beginning in 2017, after CA Ventures received a significant investment in its student-housing business, Scott asked Smith to focus 100% of his time on that line of business through CA Student Living Holding Company, LLC.[49] To fulfill this new role, Smith was promoted to President of CA Student Living.[50] While focusing on projects collectively worth in excess of $1 billion in 2018 and 2019, Smith was also tasked with starting CA Ventures Industrial division and helping to create CA Design Build and CA Ventures' new European entity.[51] All the while, Smith continued to accrue Vested Interests. While his compensation was contingent on compliance with certain LLC Agreements, Smith at no time had a written employment agreement with any CA Ventures entity.

## D. Smith's Termination

During a meeting in early January 2020, Scott informed Smith that he would be moved into a different role where he would continue to help CA Student Living, CA Industrial and CA Design Build.[52] At the end of this meeting, Scott requested that Smith agree to forfeit a majority of his Vested Interests for no payment.[53]

---

[49] Compl. ¶ 41–42.

[50] Compl. ¶ 42.

[51] Compl. ¶ 44.

[52] Compl. ¶ 54.

[53] Compl. ¶ 55.

Scott later memorialized the request in two letters, both dated January 9, 2020.[54] In one letter, Scott outlined a proposal whereby there would be a "realignment" of Smith's roles and responsibilities, including with respect to CA Student Living and CA Design Build.[55] In the other, Scott reiterated his request that Smith give up his interests in a number of the CA Ventures Subsidiary LLCs, providing a chart listing most of Smith's ownership interests and the corresponding reduction that would result from the realignment.[56] According to Smith, the request had no basis in any agreement he had reached with Scott or any CA Ventures entity.[57] In closing the second letter, Scott demanded that Smith execute an agreement forfeiting his Vested Interests within 48 hours.[58]

When Smith refused the demand, Scott threatened that if Smith did not agree to forfeit his Vested Interests, he would be terminated from all of his CA Ventures positions for "cause."[59] To sweeten the sour "forfeit for nothing" deal, Scott offered

---

[54] *Id.*

[55] *Id.*; Compl., Ex. A.

[56] Compl. ¶ 55; Compl., Ex. B.

[57] Compl. ¶ 55.

[58] *Id.*

[59] Compl. ¶ 57.

Smith $2 million for his Vested Interests.[60]  At the same time, on January 10, 2020, CA Ventures issued a press release that announced Smith's "promotion" to managing principal of CA Ventures' student living division.[61]

After Smith again refused to hand over his Vested Interests, CA Ventures and Campus Acquisitions Management, LLC, through Scott, advised Smith, by letter dated January 13, 2020, that he was terminated for "cause" effective immediately.[62] The letter explained that the termination followed Smith's "persistent performance deficiencies that have continued despite repeated discussions regarding the need for improvement with respect to these deficiencies."[63]  By way of example, the letter cited Smith's "habitual failure to dedicate a sufficient portion of [his] business time to performing [his] job duties . . . ," causing, among other harm, CA Ventures to "absorb[] over $30 million in project cost overruns" over the course of three years.[64] Because he was being terminated for "cause," Scott informed Smith that he would lose his Vested Interests in at least eleven different CA Ventures Subsidiary LLCs.[65]

---

[60] *Id.*

[61] *Id.*; Compl., Ex. D.

[62] Compl., Ex. C.

[63] *Id.*

[64] *Id.*

[65] *Id.*

### E. The LLC Agreements

Each of the twelve relevant CA Ventures Subsidiary LLCs is governed by an LLC agreement (the "LLC Agreements"). The Defendants in which Smith maintains he possesses Vested Interests are divided into three categories, Group 1, Group 2 and Group 3, based on differences in their respective LLC Agreements.[66] Groups 1 and 2 are populated based on the "cause" definition that exists in each LLC Agreement. The LLC Agreements for the "Group 1 Defendants," which include CASL Investment Management, LLC, CAV Europe Holdings, LLC, CA Senior Living Investment Management, LLC, CA Residential Investment Management, LLC, CA Design Build, LLC and CA Industrial, LLC, define "cause" (with minor deviations) as follows:

> with respect to any Person (other than the Managing Member), termination of such Person's or such Person's Key Person's Engagement with CA and/or any of its Subsidiaries (such that there is no longer an employment or service type relationship with any of the foregoing entities) by CA as a direct result of (in CA's sole discretion) any one or more of the following: (a) such Person or its Key Person having been convicted or entered a guilty plea or a plea of nolo contendere with respect to: (i) any felony and/or (ii) any crime involving moral turpitude, including misappropriation, embezzlement and similar crimes which, in any case pursuant to this clause (a), (x) was committed during the Person's or such Person's Key Person's Engagement with CA and/or any of its Affiliates and (y) results in material harm to the business of CA or any of its Affiliates; (b) (other than in the case of the Bakaya Member or its Key Person) such Person

---

[66] I note that the categories laid out here do not track the categories set out in either the Complaint or Opening Brief.

14

or its Key Person having violated any rule or regulation of any regulatory agency or self-regulatory agency; or (c) (other than in the case of the Bakaya Member or its Key Person) such Person or its Key Person having intentionally and deliberately engaged in dishonesty, willful misconduct, willful or gross neglect, bribery, fraud, misappropriation, embezzlement or misrepresentation of material facts with respect to such Person's or Key Person's employment giving rise to material harm to CA or any of its Subsidiaries.[67]

The LLC Agreements for the "Group 2 Defendants," which include CAR Team Holdings, LLC, CA Student Living Team Holdings, LLC and CA Student Living Team, LLC, contain a more expansive definition of "cause":

> "Cause" means, with respect to any Person (other than the Managing Member), termination of such Person's or such Person's Key Person's Engagement with CASLOC and/or any of its Subsidiaries (such that there is no longer an employment or service type relationship with any of the foregoing entities) by CASLOC as a direct result of (in the Company's sole discretion) any one or more of the following: (a) such Person or its Key Person having been indicted on charges of, or convicted or entered a guilty plea or a plea of nolo contendere with respect to: (i) any felony and/or (ii) any crime involving moral

---

[67] Compl., Ex. K (CASL) Art. I, Ex. N (CAV Europe) Art. I, Ex. Q (CA Senior Investment Management) Art. I, Ex. R (CA Residential) Art. I. The definition of "cause" within the LLC Agreements for CA Design Build and CA Industrial varies from the other Group 1 LLC Agreements in immaterial respects. Compl., Ex. P (CA Design Build) § 1.2, Ex. O (CA Industrial) § 1.2 ("'Cause' means any of the following with respect to any Member or its Key Person: (a) the Person has engaged in fraud, dishonesty or other willful or malicious acts or misconduct related to the Company or any of its Members; (b) the Person is prosecuted by the federal government or any state on the basis of a felony charge and such charge is not dismissed within one hundred twenty (120) days of its commencement; (c) the Person files a voluntary petition of bankruptcy; and/or (d) an involuntary petition of bankruptcy or insolvency is filed against the Person or a receiver is appointed for the Person by a court of competent jurisdiction, and such bankruptcy or receiver proceeding is not vacated or dismissed within one hundred twenty (120) days of its commencement.").

15

turpitude, including misappropriation, embezzlement and similar crimes (whether related to the such employment, engagement or otherwise); (b) such Person or its Key Person having violated any rule or regulation of any regulatory agency or self-regulatory agency; (c) such Person or its Key Person having intentionally and deliberately engaged in dishonesty, willful misconduct, willful or gross neglect, bribery, fraud, misappropriation, embezzlement or misrepresentation of material facts with respect to such Person's or Key Person's employment giving rise to material harm to CASLOC or any of its Affiliates; *(d) such Person or its Key Person having repeatedly and habitually refused to devote substantially all of such Person's or such Person's Key Person's business time and efforts to CASLOC and its Affiliates following and in direct contravention of express instructions given by Managing Member in writing (it being agreed that service on charitable and similar boards of directors shall not constitute such a refusal as long as any such involvement does not materially interfere with the performance of such Person's or such Person's Key Person's duties and obligations to CASLOC and its Affiliates)*; (e) a material breach or violation by such Person or by such Person's Key Person of any confidentiality, non-competition, non-solicitation or other similar contractual obligation or agreement binding upon such Person or such Person's Key Person in favor of CASLOC and/or any of its Subsidiaries, on the one hand, and CASLOC and/or any of its Affiliates, on the other hand; and (f) breach by such Person, in their capacity as a Participating Member, of this Agreement.[68]

The other potentially relevant provision in each LLC Agreement for the Group 1 and Group 2 Defendants, apart from the definition of "cause," is the forfeiture provision. Of the Group 1 Defendants, the LLC Agreements for CA Industrial, LLC and CA Design Build, LLC do not permit forfeiture of Vested Interests, but in the event of termination for "cause," these LLC Agreements do

---

[68] Compl., Ex. F (CAR Team Holdings) Art. I, Ex. H (CA Student Living Team Holdings) Art. I, Ex. I (CA Student Living Team) Art. I (emphasis added).

16

permit CA Ventures to purchase the terminated member's interest for an amount equal to its capital contribution.[69] The LLC Agreements for the remaining Group 1 and Group 2 Defendants contain forfeiture provisions that force a member to forfeit his Vested Interests in the event the member is terminated for "cause."[70]

For the "Group 3 Defendants," which include CA Senior, LLC, CA Student Living Holding Company, LLC and CAV Global, LLC, the LLC Agreements governing those entities either do not contain a forfeiture provision, as is the case for CA Student Living Holding Company and CAV Global, or have a for "cause" definition that requires a criminal conviction, as in the case of CA Senior.[71]

## II. ANALYSIS

The standard for deciding a Motion to Dismiss under Court of Chancery Rule 12(b)(6) is well-settled:

---

[69] Compl., Ex. P (CA Design Build) §§ 10.4, 10.8, Ex. O (CA Industrial) §§ 10.5, 10.8.

[70] Compl., Ex. F (CAR Team Holdings) § 5.2(b), Ex. H (CA Student Living Team Holdings) § 5.2(b), Ex. I (CA Student Living Team LLC), § 5.2(b), Ex. K (CASL Investment Management) § 5.2(c), Ex. N (CAV Europe Holding) § 5.4(c), Ex. Q (CA Senior Living Investment Management) § 5.2(c), Ex. R (CA Residential Investment Management) § 5.2(c).

[71] Compl., Ex. L (CA Student Living Holding), Ex. M (CAV Global), Ex. J (CA Senior) § 1.2. The January 13, 2020 letter advising Smith of his termination does not purport to revoke Smith's equity interests in CA Student Living Holding Company, LLC or CAV Global, LLC. Compl., Ex. C. As for CA Senior, LLC, Scott recognizes that its inclusion in the January 13 was a mistake. Defs.' Opening Br. in Supp. of Mot. to Dismiss ("OB") (D.I. 17) at 14 n.11. The Motion does not seek to dismiss all claims against the Group 3 Defendants, and this Opinion does not address whether Smith has well pled that he maintains his interests in these three entities because the question has not been called.

17

all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[72]

## A. Breach of the Implied Covenant of Good Faith and Fair Dealing

Smith alleges that Defendants ginned up a for cause termination as a means to strip him of his Vested Interests and thereby breached the covenant of good faith and fair dealing (the "Covenant") implied in both his oral at-will employment agreement and the LLC Agreements. According to Defendants, the Covenant claims fail because they rest on matters that are fully and expressly addressed by written contract.

"Under Delaware law, the implied covenant of good faith and fair dealing inheres in every contract."[73] To sustain a claim for a breach of the Covenant, "a complaint 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'"[74] The Covenant

---

[72] *Savor, Inc*, 812 A.2d at 896–97 (citation omitted).

[73] *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009).

[74] *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020) (quoting *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009)).

"embodies the law's expectation that each party to a contract will act with good faith toward the other with respect to the subject matter of the contract."[75] And it prevents a party from using an agreement as a shield to deny the other party the fruits of the bargain where the first party engages in bad faith conduct.[76]

While the Covenant plays an important role in the administration of contractual relationships, its application "involves a 'cautious enterprise'—inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[77] The courts of Delaware undertake this enterprise with great care to ensure they are not rewriting the parties' written contract or restructuring what one party now believes to have been a bad deal.[78]

As noted, Plaintiffs assert a claim under the Covenant with respect to both the at-will employment agreement and LLC Agreements. I address each in turn.

---

[75] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006) (internal quotations omitted).

[76] *Sheehan*, 2020 WL 2838575, at *11 ("The covenant protects an agreement's spirit against underhanded tactics that deny a party the fruits of its bargain.").

[77] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del.2005)).

[78] *Id.* at 1126 ("When conducting [an implied covenant] analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both.").

### 1. The Employment Agreement

The application of the Covenant is particularly delicate when an employee in an "at-will" employment relationship with his employer seeks to invoke the Covenant to state a claim for wrongful termination. In these instances, the court must be mindful of the "concern that the implied covenant could swallow the [employment-at-will] doctrine and effectively end at-will employment."[79]

Recognizing the need to strike a balance between the laudable purpose of the Covenant and the limited rights of an at-will employee, in *DuPont v. Pressman*, our Supreme Court held that an employee may bring a claim for breach of the Covenant only when the employer engages in "an act or acts [] manifesting bad faith or unfair dealing achieved by deceit or misrepresentation in falsifying or manipulating a record to create fictitious grounds to terminate employment."[80] Even here, however, the Covenant must be invoked and enforced cautiously. *Pressman* makes clear that terminating an at-will employee "based solely on personal motivations," including

---

[79] *Sheehan*, 2020 WL 2838575, at *11 (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 442 (Del. 1996)) (alteration in original).

[80] *Pressman*, 679 A.2d at 443–44. I note that subsequent applications of *Pressman* have clarified that actual falsification of documents to justify a termination decision is not required to sustain a claim that the employer breached the Covenant by manufacturing a basis to terminate for cause. *See, e.g.*, *Lawver v. Christiana Care Health Sys., Inc.*, 2017 WL 1167321, at *4 (Del. Super. Ct. Feb. 21, 2017) (holding that "[m]anufacturing materially false grounds *includes* the falsification or manipulation of employment records to create fictitious grounds for termination" (emphasis added)).

"dislike, hatred or ill will, alone," will not be actionable as a matter of Delaware law.[81]

This court's recent decision in *Sheehan v. AssuredPartners* provides useful guidance, post *Pressman*, regarding the application of the Covenant to a claim of wrongful termination brought by an at-will employee.[82] There, the plaintiffs were terminated for "cause," resulting in cancellation of certain of their equity interests in the company.[83] The court noted that while the employment agreements laid out the process by which employment could be terminated for "cause," that process did not address (or excuse) instances where the termination was carried out in "bad faith."[84] The court then clarified that while the plaintiffs would have to "prove at trial that [defendant] exercised its discretion in bad faith,"[85] in order "[t]o survive a motion to dismiss, [] the [plaintiffs] only must allege that the termination decision was motivated by an improper purpose."[86]

---

[81] *Pressman*, 679 A.2d at 444.

[82] 2020 WL 2838575.

[83] *Id.* at *6–7.

[84] *Id.* at *11.

[85] *Id.*

[86] *Id.*

Here, Plaintiffs allege and argue that the Covenant inheres in Smith's oral at-will employment agreement with each of the Scott-controlled entities he worked for, and Defendants violated the Covenant by purporting to fire Smith for cause when, in fact, their sole motivation was to take his Vested Interests without compensation. The allegations in the Complaint to support Plaintiffs' Covenant claim nearly mirror the allegations in *Sheehan* and, as held there, they are well-pled here.[87]

Defendants argue that Smith's oral at-will employment agreement is contextualized by the LLC Agreements, and those agreements clearly define the meaning and implications of a firing for "cause," leaving no room for the Covenant to operate.[88]  For example, each of the Group 2 Defendants' LLC Agreements includes six separate ways that an employee's termination will be deemed for "cause," including when the employee "repeatedly and habitually refused to devote substantially all of such Person's . . . business time and efforts to [the LLC]."[89]  Yet, notwithstanding similar provisions in the employment agreements at issue there, the

---

[87] *Id.* (finding a well-pled improper purpose where complaint alleges defendant fired plaintiffs "in order to steal [their] Class B Profits Interests for zero consideration and to pay nothing more than cost for the Sheehans' Class A-2 Interests" (alteration in original)); *see* Compl. ¶¶ 9, 56, 105; *see also Lawver*, 2017 WL 1167321, at *4 (holding that plaintiff well-pled a breach of the Covenant by alleging defendant had "manufactur[ed] materially false grounds" to terminate employment for cause).

[88] Defs.' Reply Br. in Supp. of Mot. to Dismiss (D.I. 27) at 13.

[89] Compl., Ex. F (CAR Team Holdings) Art. I, Ex. H (CA Student Living Team Holdings) Art. I, Ex. I (CA Student Living Team) Art. I.

22

court in *Sheehan* determined that the provisions did not excuse a termination undertaken in "bad faith."[90] The same result is compelled here. Smith has well pled that the reasons given for termination were false and were intended to mask the Defendants' design to seize Smith's Vested Interests. At this stage, that is enough to state a claim for breach of the Covenant.[91] "Whether [Plaintiffs] are entitled to damages distinct from their contract claim must await determination at a later stage."[92]

## 2. The LLC Agreements

The LLC Agreements do not plainly cover the forfeiture of Smith's Vested Interests under the circumstances alleged in the Complaint. As mentioned, the Covenant is intended "to handle developments of contractual gaps that the asserting

---

[90] *Sheehan*, 2020 WL 2838575, at *9 (including, as grounds for termination for "cause," "(ii) frequent unexplained absence or other malfeasance by Employee; . . . [and] (v) a failure to observe policies and/or standards (excluding any immaterial failure that does not actually harm or potentially harm the Company)"); *id.* at *11 (noting that the employment agreements did not cover the circumstance in which a termination would be carried out in bad faith).

[91] The facts here are distinguishable from *West v. Access Control Related Enters., LLC*, 2019 WL 2385863, at *2 (Del. Super. Ct. June 5, 2019), cited by Defendants. There, the court determined that because the employment agreement thoroughly defined "cause," any claim that the plaintiff was "tricked" into creating cause for termination "would [be counter to] Cause as defined by the contract." *Id.* Unlike *West*, whether Scott engaged in bad faith when invoking the "cause" provision is not answered by any of the specific "cause" provisions within the LLC Agreements. *Sheehan*, 2020 WL 2838575, at *11 (noting the complaint readily identified "a possible gap, specifically that a termination will not be done in 'bad faith'").

[92] *Sheehan*, 2020 WL 2838575, at *11.

23

party pleads neither party anticipated."[93]  In the context of the LLC Agreements, one such gap is a circumstance where a party to the contract dissembles a basis to terminate for cause in order to cause a forfeiture of Vested Interests.  While the LLC Agreements define "cause" in a manner that leaves few, if any, "gaps," there most certainly is a contractual gap in the failure to define what is to occur when a party to the contract invokes the "cause" provision in bad faith to avail itself of the contractual consequences of a for "cause" termination.

This is where Defendants' reliance on *West v. Access Control Related Enterprises, LLC* is misplaced.[94]  There, a severance agreement plainly provided for certain payments to be made if the employee was terminated without cause.[95] Subsequently, the employee was purportedly terminated for cause, as defined in an equity award incentive agreement.[96]  The two agreements were linked in a manner that caused the court to conclude that the definition of "cause" in the equity award incentive agreement filled any gap that may have arguably existed in the severance

---

[93] *Nemec*, 991 A.2d at 1125.

[94] *West*, 2019 WL 2385863, at *1.

[95] *Id.* ("The Severance Agreement provided for certain payments to be made to West if his employment with ACRE were terminated without 'Cause.'").

[96] *Id.*

agreement, such that a claim for breach of the Covenant was unavailable as a matter of law.[97]

Here, as explained, none of the operative contracts explain what is to happen if a party fabricates a basis to fire for cause in order to trigger a forfeiture of Vested Interests.[98] It is at least reasonably conceivable that Smith's bad faith termination for cause, and the resulting forfeiture of Smith's Vested Interests, would not violate a specific term of the LLC Agreements, but would constitute breach of the Covenant. Accordingly, the claims survive dismissal.

## B. Breach of Fiduciary Duty

Smith alleges he was owed fiduciary duties and those duties were breached when Defendants wrongfully cancelled his Vested Interests. In response, Defendants argue Plaintiffs' fiduciary duty claim fails because it is waived by the plain language of the LLC Agreements.

The Delaware Limited Liability Company Act (the "LLC Act") provides that "the fiduciary duties of a member, manager, or other person that is a party to or

---

[97] *Id.* at *3 (noting that the claim the employer did not, in fact, terminate for cause was expressly addressed by the contracts).

[98] Compl., Ex. F (CAR Team Holdings) § 5.2(b), Ex. H (CA Student Living Team Holdings) § 5.2(b), Ex. I (CA Student Living Team LLC), § 5.2(b), Ex. K (CASL Investment Management) § 5.2(c), Ex. N (CAV Europe Holding) § 5.4(c), Ex. Q (CA Senior Living Investment Management) § 5.2, Ex. R (CA Residential Investment Management) § 5.2(c).

bound by a limited liability company agreement may be expanded or restricted or eliminated by provisions in the limited liability company agreement."[99]  If the operating agreement is silent with respect to standards of conduct, then, "[b]y default, the traditional fiduciary duties applicable to corporations [will] apply . . ."[100]  If, on the other hand, an LLC's operating agreement plainly disclaims, restricts or limits the duties of its managers and members, the parties must look to the agreement's "provisions to understand their rights and remedies."[101]

"Drafters of a limited liability company agreement 'must make their intent to eliminate fiduciary duties plain and unambiguous.'"[102]  This court has determined

---

[99] *Zimmerman v. Crothall*, 62 A.3d 676, 702 (Del. Ch. 2013) (internal quotations omitted); 6 *Del. C.* § 18–1101(c) ("To the extent that, at law or in equity, a member . . . has duties (including fiduciary duties) to a limited liability company or to another member . . . , the member's . . . duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement . . . .").

[100] *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261, at *12 (Del. Ch. Sept. 4, 2014); *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 852 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012) ("[T]he [LLC] statute allows the parties to an LLC agreement to entirely supplant those default [fiduciary duty] principles or to modify them in part.  Where the parties have clearly supplanted default principles in full, we give effect to the parties' contract choice.  Where the parties have clearly supplanted default principles in part, we give effect to their contract choice."); *Miller v. HCP & Co.*, 2018 WL 656378, at *8 (Del. Ch. Feb. 1, 2018) ("The Delaware Limited Liability Company Act permits parties to an LLC agreement to eliminate fiduciary duties that members or managers would otherwise owe to one another.").

[101] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 253 (Del. 2017).

[102] *Ross Hldg.*, 2014 WL 4374261, at *12 (quoting *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012)).

that an LLC agreement's "language unambiguously eliminates the traditional fiduciary duties" when it states: "none of the Directors . . .shall have any duties or liabilities, including fiduciary duties, to the Company or any Member."[103]  When such language exists, the only duties imposed "are those set forth elsewhere in the LLC Agreement."[104]  Here, each of the operative LLC Agreements contains a nearly identical express waiver of traditional fiduciary duties.[105]  For example, in the vast majority of the LLC Agreements, the relevant section reads: "The provisions of this Agreement replace, eliminate, and otherwise supplant those duties (including fiduciary duties) and liabilities that the Managing Member might otherwise have with respect to each other."[106]

In the sentence immediately preceding the express waiver of traditional fiduciary duties, the LLC Agreements provide that the managing member must act "(i) in accordance with this Agreement and the implied covenant of good faith and

---

[103] *In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *12 (Del. Ch. Oct. 28, 2010); *see also Bandera Master Fund LP v. Boardwalk Pipeline P'rs*, *LP*, 2019 WL 4927053, at *8 (Del. Ch. Oct. 7, 2019) ("Except as expressly set forth in this Agreement, neither the General Partner nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner or Assignee.").

[104] *Atlas Energy*, 2010 WL 4273122, at *12.

[105] Defs.' Opening Br. in Supp. of Mot. to Dismiss ("OB") (D.I. 17), Ex. 3, col. B.

[106] *See* Compl., Ex. F, H, I, K, Q, R § 10.10.

fair dealing and (ii) in a manner that does not constitute gross negligence or fraud."[107]

While these contractual standards track, to some extent, Delaware's common law fiduciary duties, they can and must stand on their own as contractual covenants that expressly and exclusively govern the conduct of managers and members.[108] Parties intending to impose a duty of loyalty through contractual standards will include language that prohibits conflict transactions or makes clear that managers or members may not act in "bad faith" or engage in "willful misconduct."[109] When parties to an LLC operating agreement elect not to include contractual standards that track the common law duty of loyalty, that election cannot be ignored.[110] The parties to the LLC Agreements at issue here made that election and, by doing so, made clear

---

[107] *Id.*

[108] *See, e.g.*, *Zimmerman*, 62 A.3d at 703 (limiting the role of the court to determining whether the defendants complied with the agreement's replacement contractual duties rather than traditional fiduciary duties).

[109] *United Bhd. of Carpenters Pension Plan v. Fellner*, 2015 WL 894810, at *4 (Del. Ch. Feb. 26, 2015) ("Willful misconduct is one standard for evaluating whether a fiduciary breached the duty of loyalty by acting in bad faith."); *Feeley*, 62 A.3d at 664 (same); *Zimmerman v. Crothall*, 2012 WL 707238, at *6 (Del. Ch. Mar. 5, 2012), as revised (Mar. 27, 2012) (concluding that "self-dealing" and "willful misconduct" correspond with the duty of loyalty).

[110] *Bandera*, 2019 WL 4927053, at *10 (permitting a disclaimer of all traditional fiduciary duties, including the duty of loyalty, and holding that based on the contractual language, the defendant general partner only owed a contractual duty of good faith different than a common law good faith standard).

that only claims for breach of the Covenant (already addressed), "gross negligence" (duty of care)[111] or fraud may be brought against managers or members.

The fact that a plaintiff styles a breach of a contractual standard of conduct as a breach of fiduciary duty in his complaint, as Plaintiffs have done here, is not, alone, fatal to the claim.[112] What matters is whether Plaintiffs have well pled either gross negligence or fraud. They have not. The phrase "gross negligence" does not appear in the Complaint a single time, and Plaintiffs make no effort to plead that Defendants acted without due care. Indeed, the allegations are that Defendants knew exactly what they were doing when they manufactured a for cause termination to get at Smith's Vested Interests.

There is also no well pled claim of fraud. While Plaintiffs appear to argue that the LLC Agreements' reference to fraud as a contractual standard of conduct somehow lessens their burden to plead fraud with particularity,[113] that argument

---

[111] *Feeley*, 62 A.3d at 664 ("Gross negligence is the standard for evaluating a breach of the duty of care.").

[112] *See, e.g.*, *CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *18 (Del. Ch. June 23, 2015) (concluding that the complaint well pleads certain breaches of contractual duties even though such claims were pled as breaches of common law fiduciary duties); *Atlas Energy*, 2010 WL 4273122, at *12 (analyzing the complaint's common law fiduciary duty claims under the contractual duty of good faith).

[113] Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss (D.I. 23) at 38.

finds no support in our law. Fraud is fraud and it must be pled with particularity in all of its forms.[114] Plaintiffs made no effort to carry that burden here.

Because the LLC Agreements waive traditional fiduciary duties and supplant them with contractual standards of conduct, and Plaintiffs fail to well plead breaches of those contractual standards, their breach of fiduciary duty claim must be dismissed.[115]

## C. Conversion

Plaintiffs allege Defendants' seizure of the Vested Interests constitutes conversion. Defendants counter that the claim fails because it duplicates Plaintiffs' breach of contract claim.

Conversion, a claim sounding in tort, is "any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right,

---

[114] Del. Ch. Ct. R. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

[115] Plaintiffs argue the termination letter indicates that an entity named Campus Acquisitions Management, LLC made the decision to terminate Smith. Compl., Ex. C. They reason that because Smith is not a member of this LLC, the LLC Agreement cannot replace traditional fiduciary duties. Even assuming Smith is correct, if Smith is not a member of the relevant LLC, then that LLC does not owe fiduciary duties to him. 6 *Del. C.* § 18-1101(c) (noting that, to the extent any fiduciary duties are owed, they are owed "to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement"). Thus, at least in his role as manager of Campus Acquisitions Management, LLC, Scott owed no fiduciary duties to Smith.

or inconsistent with it."[116] "Under Delaware law, a plaintiff bringing a claim based entirely upon a breach of the terms of a contract generally must sue in contract, and not in tort."[117] "In order to assert a tort claim along with a contract claim, the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract."[118]

If Plaintiffs fail to prove that Defendants breached the LLC Agreements by manufacturing a termination of Smith for cause, then they would also fail in proving that Plaintiffs' Vested Interests were converted. To reiterate, if Smith was terminated for cause, the Vested Interests, by contract, were forfeited.[119] If the termination for cause was manufactured as justification to take from Plaintiffs what was rightfully theirs, however, that would plausibly meet the elements of conversion—there would be an "act of dominion wrongfully exerted" over the Vested Interests "in denial of [Plaintiffs] rights."[120]

---

[116] *Kuroda*, 971 A.2d at 889 (alterations in original).

[117] *Sheehan*, 2020 WL 2838575, at *14 (quoting *West*, 2019 WL 2385863, at *2).

[118] *Kuroda*, 971 A.2d at 889.

[119] Compl. ¶¶ 96, 97, 116–118, 122; *Kuroda*, 971 A.2d at 890 ("[T]o establish a claim for conversion apart from the contract claim, Kuroda would have to show that he had a right to the money—other than a right pursuant to the contract—that was violated by the defendants' exercise of dominion over the money.").

[120] *Kuroda*, 971 A.2d at 889.

While it is true the propriety of the forfeiture turns on contractual rights and obligations, and in this sense the conversion claim overlaps with the breach of contract claim, Plaintiffs have well pled Defendants acted without Plaintiffs' consent wrongfully to seize their property.[121] And, unlike *Sheehan*, where the court found the conversion claim duplicative of the breach of contract claim since, in connection with both claims, the plaintiff sought the return of the allegedly forfeited equity,[122] Plaintiffs here seek a "traditional remedy for a conversion"—"the value of the property at the time of the conversion, with interest."[123] As discussed below, Defendants maintain that Plaintiffs may not achieve that remedy through their breach of contract claims, and the point is well taken. If that should prove to be the case, it surely will be the case that the conversion claim is not duplicative of the breach of contract claim. That remains to be seen. For now, the conversion claim survives.

## D. The Illinois Wage Payment and Collection Act

Plaintiffs allege the manufactured forfeiture of the Vested Interests violates the Wage Act. Defendants disagree and move to dismiss this statutory claim.

---

[121] *See Tansey v. Trade Show News Networks, Inc.*, 2001 WL 1526306, at *6 (Del. Ch. Nov. 27, 2001) (holding that the wrongful seizure of stock constituted conversion).

[122] *Sheehan*, 2020 WL 2838575, at *14.

[123] *Tansey*, 2001 WL 1526306, at *8.

32

"The purpose of the Wage Act is to provide employees with a cause of action for the timely and complete payment of earned wages or final compensation."[124] To prevail on a claim under the statute, the employee must demonstrate that "wages or final compensation is due to him or her as an employee from an employer under an employment contract or agreement."[125] The Wage Act's punitive aspects—a 2% interest penalty and the right to recover attorneys' fees and costs—serve as protections for employees and incentives to employers to pay their workers what they are owed when they are owed it.[126]

### 1. Vested Interests As "Earned Wages" or "Final Compensation"

The Wage Act requires employers to "pay every employee all wages earned during the semi-monthly pay period."[127] "Wages" are defined "as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties."[128] Based on this definition, and as explained below, it is

---

[124] *Majmudar v. House of Spices (India), Inc.*, 1 N.E.3d 1207, 1210 (Ill. App. Ct. 2013).

[125] *Landers–Scelfo v. Corporate Office Systems, Inc.*, 827 N.E.2d 1051, 1067 (Ill. App. Ct. 2005).

[126] The Illinois Wage Payment and Collection Act, 820 ILCS 115/14.

[127] 820 ILCS 115/3.

[128] 820 ILCS 115/2.

reasonable to infer that Smith's Vested Interests were intended as compensation and can be characterized, therefore, as earned wages.[129]

In *Kim v. Citigroup*, the court determined that certain unvested stock awards were part of an employee's compensation and qualified as "earned wages" where the agreement providing such awards clearly stated the stock awards were intended as compensation.[130] Here, the Complaint well pleads the Vested Interests were part of Smith's compensation package as an employee of the CA Ventures entities, in addition to other standard salary and benefits.[131] For example, Smith was awarded certain PPU awards in CA Residential, LLC and CA Student Living Holding Company, LLC based on his performance at the CA Ventures entities.[132] And, looking at each LLC Agreement, it is clear that Smith and his related entities, in fact, held the interests they purported to hold.[133]

---

[129] Compl. ¶¶ 49–50.

[130] *Kim v. Citigroup, Inc.*, 856 N.E.2d 639, 646 (Ill. App. Ct. 2006) (holding that the "CAP stock was compensation and, therefore, governed by the Wage Act based upon the plain language of the election agreement"); *id.* at 642 ("The retained amounts included approximately $18,386 of earned wages which had been paid to Kim in the form of the CAP stock.")

[131] Compl. ¶¶ 48–52.

[132] Compl. ¶ 49.

[133] *See, e.g.*, Compl., Ex. J, at Ex. A (noting Kenilworth Ventures, LLC as maintaining a 12.16% membership interest).

Defendants argue that even if the Vested Interests are classified as "compensation," these interests are not "final compensation" as contemplated by the Wage Act because the interests had already been paid and, therefore, were not "owed." "Final compensation" is defined as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties."[134] The Illinois appeals court in *Majmudar v. House of Spices (India)* used the dictionary to define "owe" to mean "under obligation to pay or repay in return for something received: be indebted in the sum of."[135] Defendants argue that because they had already paid Smith his Vested Interests, he was no longer "owed" those interests. Even if that were true, and Smith contests this, if Smith is able to prove that Defendants, as employers, wrongfully stripped him of the Vested Interests, he would then be able to prove that the employer has denied him compensation that is due and owing. Moreover, as mentioned, even if the Vested Interests cannot readily be classified as "final compensation," they are plausibly "earned wages" under the statute.[136]

---

[134] 820 ILCS 115/2.

[135] *Majmudar*, 1 N.E.3d at 1211.

[136] *See Kim*, 856 N.E.2d at 646.

Whether classified as "earned wages" or "final compensation," either is sufficient to bring the Vested Interests under the purview of the Wage Act.

## 2. The Improper "Deduction" Under the Wage Act

Plaintiffs allege that because the forfeiture of Smith's Vested Interests constitutes a "deduction" from final compensation, and this particular deduction did not meet the statutory requirements, the forfeiture is a violation of the Wage Act. The Wage Act prohibits "deductions by employers from wages or final compensation" unless certain conditions are met.[137] Those conditions are satisfied if "such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; or (4) made with the express written consent of the employee, given freely at the time the deduction is made."[138]

In the context of restricted stock options, the court in *Kim* held that the employers' decision to withhold the options should be deemed a proper deduction because it was in response "to a valid wage deduction order with plaintiff's express written consent, which was voluntarily given."[139] Here, there is no indication that

---

[137] 820 ILCS 115/9; *Osorio v. The Tile Shop, LLC*, 939 F.3d 847, 850 (7th Cir. 2019).

[138] 820 ILCS 115/9.

[139] *Kim*, 856 N.E.2d at 646. I note that *Osorio v. The Tile Shop*, cited by Defendants, is inapposite. 939 F.3d at 850. There, the Seventh Circuit concluded that "the term 'deductions' as used in the Act refers to withholdings from an employee's gross wages, not the formula used to calculate an employee's gross wages." *Id.* at 852. *Osorio* did not speak

any of the statutory conditions to a valid deduction have been satisfied. Defendants do not argue that they have withheld the Vested Interests as required by law, for the benefit of Smith, in response to a valid wage assignment order or otherwise with Smith's consent. Accordingly, since it is at least reasonably conceivable that the Vested Interests can be considered "earned wages" and that forfeiture of the Vested Interests can be classified as an improper deduction, Plaintiffs' Wage Act claim is well pled and survives dismissal.[140]

---

to whether withholding stock awards could be classified as deductions. That question was answered definitively and persuasively in *Kim*. *Kim*, 856 N.E.2d at 646.

[140] Defendants make two more arguments, each of which I find unpersuasive. *First*, they argue that *Kim* supports the proposition that forfeitures of earned compensation do not violate Illinois public policy and, therefore, the forfeiture of Smith's shares is not actionable. OB at 46–47; *Kim*, 856 N.E.2d at 646. Defendants are correct in stating that forfeiture of earned compensation will not, *per se*, offend Illinois public policy, but this misses the point. Here, Plaintiffs have well pled that the Vested Interests are "earned wages" or "final compensation" and the Defendants, as employers, improperly deducted from what was owed Smith through the wrongful forfeiture. This states a viable claim under the Wage Act. *Second*, Defendants argue that *Majmudar v. House of Spices (India), Inc.* held that when there is a dispute over termination for "cause," the Wage Act cannot apply. OB at 45 (citing *Majmudar*, 1 N.E.3d at 1212). In my view, however, *Majmudar*'s holding is cabined to a dispute over "unpaid future wages" and whether "unpaid future wages" can properly be classified as "final compensation." *Majmudar*, 1 N.E.3d at 1211 ("Therefore, in these circumstances, the unpaid future wages pursuant to the terminated contract is not final compensation and cannot be recovered under the Act."). Thus, while it is true the court there determined that allowing a claim for future wages to proceed under the Wage Act when the employer and employee were still disputing whether the employee was terminated for cause would create an "unfair burden on employers that may have a reasonable employment dispute with separated employees," there is no indication the court intended to extend that ruling to cases where the employee was seeking enforcement of the Wage Act to remedy unpaid wages already earned. *Id.* Indeed, a ruling to that effect would undoubtedly encourage all employers to claim the employee was terminated for "cause" in

## E. Defamation

The Court of Chancery is a court of "limited jurisdiction;" it maintains subject matter jurisdiction "only when (1) the complaint states a claim for relief that is equitable in character, (2) the complaint requests an equitable remedy when there is no adequate remedy at law or (3) Chancery is vested with jurisdiction by statute."[141] In addition to these settled bases for subject matter jurisdiction, to avoid piecemeal litigation, the so-called "clean-up doctrine" provides Chancery the discretion to exercise subject matter jurisdiction over a claim at law if the plaintiff has stated a *bona fide* claim over which Chancery has original subject matter jurisdiction.[142] With respect to claims for defamation, however, "the Court of Chancery, in all instances, lacks subject matter jurisdiction to adjudicate the questions of whether a defendant made a false statement about the plaintiff and whether it did so with actual malice."[143] The rationale for this perspective was well stated by Vice Chancellor

---

order to avoid the application of the Wage Act in all instances. That, of course, would defeat the remedial purpose of the statute.

[141]*Perlman v. Vox Media, Inc.*, 2019 WL 2647520, at *4 (Del. Ch. June 27, 2019), *aff'd*, 2021 WL 1042985 (Del. Mar. 18, 2021); *see also* 10 *Del. C*. § 342 ("The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State.").

[142] *Perlman*, 2019 WL 2647520 at *4; *Kraft v. Wisdom Trees Invs., Inc.*, 145 A.3d 969, 975 (Del. Ch. 2016).

[143] *Perlman*, 2019 WL 2647520 at *1. I note that, as provided in *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 119–27 (Del. Ch. 2017), there are limited exceptions to this rule,

Laster in his scholarly opinion in *Organovo Holdings, Inc. v. Dimitrov*, and need not be repeated at length here. [144] Suffice it to say that issues of "falsity and malice [are] for the collective wisdom of a jury rather than [] a judge as the sole arbiter of defamation and libel."[145]

To the extent the parties would have me exercise subject matter jurisdiction over Plaintiffs' defamation claim under the "clean-up" doctrine, I decline to do so.[146] The "clean-up" doctrine serves the important function of avoiding, when appropriate, piecemeal litigation, but the historical imperative that a jury, not a judge, should evaluate whether a defendant's statements are defamatory shines even brighter.[147] Accordingly, I will dismiss Count VII of the Complaint subject to the

---

specifically for trade libel and adjudicated falsehoods. Those exceptions, however, do not apply here.

[144] *Organovo*, 162 A.3d at 116 (explaining that the common law roots of defamation recognized that "jurors, rather than judges, [should exercise] the power to determine whether publications were in fact defamatory" (quoting Michael I. Meyerson, *The Neglected History of the Prior Restraint Doctrine: Rediscovering the Link Between the First Amendment and the Separation of Powers*, 34 Ind. L. Rev. 295, 306 (2001))).

[145] *Perlman*, 2019 WL 2647520, at *5.

[146] *Nichols v. Lewis*, 2007 WL 1584622, at *1 (Del. Ch. May 24, 2007) (discussing this court's discretionary powers under the "clean-up" doctrine).

[147] *See Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1180, 1183 (Del. 2000) (concluding that a "claim of defamation was correctly submitted to the jury" because the "issue of whether the article [in question] was fact or opinion posed a jury question"); *Midland Food Services v. Castle Hills Hldgs.*, 1999 WL 669324, at *3 (Del. Ch.1999), *aff'd*, 782 A.2d 265 (Del. 2001) (declining to exercise discretionary jurisdiction where "[n]either efficiency or fairness would be enhanced").

39

Plaintiffs' right to elect under 10 *Del. C.* § 1902 to have the claim transferred to the Superior Court of Delaware.

## F. The Claims Against DiBiase

When a plaintiff asserts claims against multiple defendants, at a minimum, his complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" as to each defendant.[148]  To plead a viable claim of breach of fiduciary duty, for example, Plaintiffs must allege "sufficiently detailed acts of wrongdoing to place [each] defendant on notice of what [that defendant] purportedly did wrong."[149]

The Complaint names DiBiase as a defendant in Counts I–VI.[150]  The only allegation against DiBiase is that, in his role as manager of CAV Global, LLC, he was controlled by Scott and could not "make any 'major decisions' without the consent of Defendant Scott."[151]  Alleging that a manager is "controlled" by a wrongdoer is a far cry from alleging that the manager, himself, has engaged in

---

[148] Del. Ct. Ch. R. 8(a).

[149] *In re Viacom Inc. S'holders Litig.*, 2020 WL 7711128, at *25 (Del. Ch. Dec. 29, 2020) (quoting *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009)).

[150] Compl. ¶ 19(l).

[151] *Id.*

wrongdoing.[152]   Here, the Complaint fails to well plead a single allegation that DiBiase participated in Smith's termination or otherwise had a role in Scott's alleged scheme to strip Smith of his Vested Interests.  Because Plaintiffs have failed to allege DiBiase engaged in "actionable wrongdoing," all claims against him must be dismissed.[153]

## G. The "Buyout" Remedy

As noted, among Plaintiffs' prayers for relief is a request that the Court order Defendants to pay Plaintiffs the value of the purportedly forfeited Vested Interests. Defendants maintain that this relief does not exist in the Court's remedial toolbox. According to Defendants, in the event Plaintiffs prevail on their claims at trial, the only remedy they can achieve is reinstatement of the Vested Interests.  While I disagree with this proposition as relates to the conversion claim for reasons already explained,[154] the proposition may hold true with respect to the contract-related claims (Counts I–III).  Even so, in my view, while it is not certain that a "buyout"

---

[152] *Viacom*, 2020 WL 7711128, at *25 (dismissing claims against an executive notwithstanding the existence of a controller and the application of entire fairness because the complaint failed to allege wrongdoing as against that executive); *see, e.g.*, *In re Cornerstone Therapeutics, Inc. S'holder Litig.*, 115 A.3d 1173, 1182–83 (Del. 2015) (noting that, even when a controller exists and entire fairness applies to the controller's action, the presumption of the business judgment rule still applies for each individual fiduciary unless specific wrongdoing is alleged as against that specific fiduciary).

[153] *Viacom*, 2020 WL 7711128, at *25.

[154] *Tansey*, 2001 WL 1526306, at *8.

fits within the realm of expectation damages, it is simply premature to make that call on a pleading stage motion.[155]

"Contract damages are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed. Such damages should not act as a windfall."[156] "Historically, damages for breach of contract have been limited to the non-breaching parties' expectation interest."[157] "Expectation damages are measured by the losses caused and gains prevented by defendant's breach."[158]

In support of their argument that Plaintiffs have no right to a forced buyout, Defendants cite *Blaustein v. Lord Baltimore Capital Corp.*, where our Supreme Court held that a minority stockholder did not possess an *inherent* right to be bought

---

[155] I recognize that Count VI (the Wage Act claim) has likewise survived the Motion, but that only provides a further reason why a "buyout" remedy cannot be dismissed at this stage. Even if a "buyout" is not the expectation of the parties because of the forfeiture language in the LLC Agreements, the grant of a damages award equaling the fair value of Smith's shares could very well be available as a remedy under the Wage Act. *Zabinsky v. Gelber Gp., Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 2004) ("The Act provides an employee with remedies more expansive than a common law breach of contract action when it uses the words 'employment contract or agreement.'").

[156] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (internal quotations omitted).

[157] *Pressman*, 679 A.2d at 445.

[158] *Paul*, 974 A.2d at 146–47; *see also* E. Allan Farnsworth, *Legal Remedies for Breach of Contract*, 70 Colum. L. Rev. 1145, 1147 (1970) ("Our system, then, is not directed at compulsion of promisors to prevent breach; rather, it is aimed at relief to promisees to redress breach.").

out because, "[u]nder common law, the directors of a closely held corporation have no general fiduciary duty to repurchase the stock of a minority stockholder."[159]  Here again, Defendants' cited authority misses the point.  The question is not whether the Defendants have a fiduciary duty to repurchase Smith's Vested Interests, but whether a buyout should be available as a potential remedy for breach of contract.

Defendants next argue that the Group 1 and Group 2 Defendants' LLC Agreements expressly provide for what happens in the event of forfeiture.  In the case of all Group 1 and 2 Defendants (except for CA Industrial, LLC and CA Design Build, LLC), if Smith was fired for "cause," he forfeits his entire membership interests.[160]  As for CA Industrial and CA Design Build, their LLC Agreements provide only for the return of Smith's capital contribution and nothing more.[161]  While Defendants correctly describe the state of the forfeiture provisions in each

---

[159] *Blaustein v. Lord Baltimore Cap. Corp.*, 84 A.3d 954, 958 (Del. 2014); *see also Nixon v. Blackwell*, 626 A.2d 1366, 1380 (Del. 1993) ("The tools of good corporate practice are designed to give a purchasing minority stockholder the opportunity to bargain for protection before parting with consideration.  It would do violence to normal corporate practice and our corporation law to fashion an ad hoc ruling which would result in a court-imposed stockholder buy-out for which the parties had not contracted.").

[160] Compl., Ex. F (CAR Team Holdings) § 5.2(b), Ex. H (CA Student Living Team Holdings) § 5.2(b), Ex. I (CA Student Living Team LLC), § 5.2(b), Ex. K (CASL Investment Management) § 5.2(c), Ex. N (CAV Europe Holding) § 5.4(c), Ex. Q (CA Senior Living Investment Management) § 5.2(c), Ex. R (CA Residential Investment Management) § 5.2(c).

[161] Compl., Ex. P (CA Design Build) §§ 10.4, 10.8, Ex. O (CA Industrial) §§ 10.5, 10.8.

LLC Agreement, these provisions do not speak to what happens in the event that certain membership interests are wrongfully forfeited. In that circumstance, if the Court finds the conduct of Defendants to be in breach of contract, the Court is then obliged to put Plaintiffs in the position they would have occupied but for the breach. That position might be, as Defendants suggest, the return of Smith's Vested Interests. But it is also reasonably conceivable that a buyout will better serve this remedial requisite. This determination should be made on a more developed record.[162] Indeed, "what is important at the pleadings stage is that [Plaintiffs] has given the [Defendants] sufficient notice as to the damages [they are] claiming."[163] And, Plaintiffs' prayer for relief in pursuit of a buyout remedy indisputably does just that.

## H. Punitive Damages

The Complaint seeks an award of punitive damages in both Count V (Conversion) and Count VII (Defamation). The defamation claim will be dismissed for want of subject matter jurisdiction on the condition that Plaintiffs may pursue the

---

[162] *Whittington v. Dragon Gp. L.L.C.*, 2011 WL 1457455, at *15 (Del. Ch. Apr. 15, 2011); *Domain Assocs., L.L.C. v. Shah*, 2018 WL 3853531, at *14 (Del. Ch. Aug. 13, 2018); *Pharm. Prod. Dev., Inc. v. TVM Life Sci. Ventures VI, L.P.*, 2011 WL 549163, at *7 (Del. Ch. Feb. 16, 2011) (holding that, on a motion to dismiss, the court could not indisputably classify damages as general versus special).

[163] *Pharm. Prod. Dev.*, 2011 WL 549163, at *7.

claim in a court that actually *can* award punitive damages. As for the conversion claim, this court of equity has no authority to grant punitive relief.[164]

## III.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Counts IV and VII,[165] as well as all claims against DiBiase and all prayers for punitive damages, is GRANTED. Defendants' Motion to Dismiss Counts III, V and VI, as well as the "fair value" remedy sought in Counts I–III, V and VI is DENIED.

**IT IS SO ORDERED.**

---

[164] *Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at \*8 (Del. Ch. Jan. 13, 2014) (dismissing punitive damages as a remedy because "this Court has only that jurisdiction enjoyed by the English Court of Chancery in 1776, as supplemented by the General Assembly, and neither source permits the Court to award exemplary or punitive damages"); *Beals v. Washington Int'l, Inc.*, 386 A.2d 1156, 1159 (Del. Ch. 1978) ("Traditionally and historically the Court of Chancery as the Equity Court is a court of conscience and will permit only what is just and right with no element of vengeance and therefore will not enforce penalties or forfeitures.").

[165] Plaintiffs shall file their election to transfer Count VII to the Superior Court within sixty (60) days of this Opinion and Order. 10 *Del. C.* § 1902.